******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# VICTOR A. WOZNIAK ET AL. *v.* TOWN OF COLCHESTER
## (AC 41275)

Alvord, Elgo and Moll, Js.

*Syllabus*

The plaintiffs, V and O, appealed to this court from the summary judgment rendered by the trial court in favor of the defendant town of Colchester. The plaintiffs owned an undeveloped parcel of real property located in Colchester in an area that is designated as a flood zone on a map prepared by the Federal Emergency Management Agency (FEMA). A survey indicated that the map incorrectly located a portion of a brook on the property, which the plaintiffs claimed caused the property to be improperly designated as being in a flood zone. V submitted to FEMA an application for a Letter of Map Amendment to correct the map, and FEMA requested additional information. The plaintiffs thereafter demanded that the defendant file an application for a Letter of Map Revision (LOMR) with FEMA on their behalf, and when the defendant declined, the plaintiffs commenced this action seeking a writ of mandamus to compel the defendant to do so. The plaintiffs contended that the applicable federal regulations (44 C.F.R. §§ 65.3 and 65.7) impose a ministerial duty on the defendant to file a LOMR application on their behalf to rectify the incorrect depiction of their property on the map. After the plaintiffs appealed to this court from the summary judgment rendered in the defendant's favor, the defendant filed a motion to dismiss the appeal, alleging that the appeal had been rendered moot by certain recent developments. Specifically, in 2016, FEMA officials informed the defendant of a new program that was intended to help communities reduce their flood risk. The defendant's town engineer asked FEMA to review the flood zone mapping in the area of the subject brook for potential conflicts between the flood limits shown on the map and the actual flood limit elevations based on topography. In 2018, FEMA notified the defendant that it had completed the discovery portion of the new program and had selected the brook for an upcoming study. This court denied the defendant's motion to dismiss the appeal without prejudice. *Held*:

1. The defendant's claim that the appeal was moot was unavailing, as FEMA's pending study of the brook did not render the appeal moot; correspondence from FEMA to the defendant indicated that the new program was being implemented for the first time, and the record did not indicate when the program would conclude or when any final determination regarding the brook would transpire, and, guided by the fundamental precept that this court must indulge every reasonable presumption in favor of jurisdiction in resolving the issue of mootness, this court could not conclude on the limited record before it that the pending review of the brook under the program necessarily deprived this court of the ability to provide the plaintiffs with any meaningful relief.

2. The trial court properly rendered summary judgment in favor of the defendant and determined that there was no genuine issue of material fact that the plaintiffs were not entitled to a writ of mandamus to compel the defendant to file a LOMR application on their behalf:

a. Despite the plaintiffs' contention that the defendant owed a duty to initiate a LOMR application pursuant to § 65.3, by its plain language § 65.3 concerns physical changes to property, it was undisputed that no physical change affecting flooding conditions had occurred with respect to the plaintiffs' property, as the plaintiffs' claim was that the brook was improperly depicted on a portion of their property since the map was promulgated, and, therefore, in the absence of any allegation that the plaintiffs' property underwent any physical change or that it was affected by a physical change to another property, the plaintiffs' claim was untenable; moreover, to the extent that the plaintiffs attempted to inject new factual allegations into the case for the first time on appeal, such allegations were improper, having never been raised before the trial court, and this court declined to consider them.

b. The plaintiffs could not prevail in their claim that § 65.7 imposed a ministerial duty on the defendant to file a LOMR application to correct the inaccurate description of the brook on their behalf: a prerequisite to the extraordinary relief afforded by a writ of mandamus is the existence of a ministerial duty, and a community's determination pursuant to § 65.7, as to whether any "practicable alternatives exist" to revising the boundaries of a previously adopted floodway is a quintessentially discretionary function, as opposed to a ministerial function, as that determination requires a community to exercise its judgment as to whether alternatives to revising such boundaries are practical; moreover, the applicable federal regulation (44 C.F.R. § 72.1) expressly indicates that LOMR applications are predicated on proposed or actual manmade alterations within the floodplain, § 65.7 plainly and unambiguously concerns changes to floodways, and because the plaintiffs did not allege any manmade alterations or physical changes affecting their property or the designation thereof, § 65.7 was inapposite to the present case.

c. The plaintiffs did not demonstrate that they had no adequate remedy at law: the plaintiffs neither alleged in their complaint nor provided any evidence that property owners are precluded from filing LOMR applications, and a review of the regulatory scheme indicated that property owners were not precluded from filing LOMR applications, as the National Flood Insurance Program plainly envisions the filing of LOMR applications by parties other than local communities such as the defendant; moreover, the instructions provided by FEMA for completing LOMR applications require the submission of a concurrence form with signatures of the requester, community official and engineer, the purpose of which is to ensure that the community is aware of the impacts of the LOMR application and which was further evidence that the program envisions applicants other than local communities, and the plaintiffs presented no basis on which this court reasonably could conclude that a property owner is prohibited, as a matter of federal administrative law, from filing a LOMR application, and the availability of that legal remedy, which would provide the plaintiffs the relief that they sought, was fatal to their mandamus action.

Argued April 9—officially released October 29, 2019

*Procedural History*

Action seeking, inter alia, a writ of mandamus, and for other relief, brought to the Superior Court in the judicial district of New London, where the court, *Knox, J.*, granted the motion filed by the defendant for summary judgment and rendered judgment thereon, from which the plaintiffs appealed to this court; thereafter, the defendant filed a motion to dismiss the appeal, which this court denied without prejudice. *Affirmed.*

*Paul M. Geraghty*, for the appellants (plaintiffs).

*Matthew Ranelli*, with whom, on the brief, was *Amber N. Sarno*, for the appellee (defendant).

*Opinion*

ELGO, J. This case concerns the obligation of a municipality to file an application on behalf of a property owner to correct flood maps promulgated by federal administrative authorities. The plaintiffs, Victor A. Wozniak and Olga E. Wozniak,[1] appeal from the summary judgment rendered in favor of the defendant, the town of Colchester. The dispositive issue is whether the trial court properly determined that no genuine issue of material fact existed as to whether the plaintiffs were entitled to a writ of mandamus.[2] We affirm the judgment of the trial court.

We begin by providing necessary context for the present dispute. "Prior to 1968, there was a growing concern that the private insurance industry was unable to offer reasonably priced flood insurance on a national basis. . . . Congress passed the National Flood Insurance Act (NFIA) of 1968 to address this concern.[3] The purposes of the NFIA were to provide affordable flood insurance throughout the nation, encourage appropriate land use that would minimize the exposure of property to flood damage and loss, and thereby reduce federal expenditures for flood losses and disaster assistance. . . . To that end, NFIA authorized the Federal Emergency Management Agency (FEMA) to establish and carry out the National Flood Insurance Program . . . . There are three basic components of [that program]: (1) the identification and mapping of flood-prone communities, (2) the requirement that communities adopt and enforce floodplain management regulations that meet minimum eligibility criteria in order to qualify for flood insurance, and (3) the provision of flood insurance." (Citations omitted; footnote added; internal quotation marks omitted.) *National Wildlife Federation* v. *Federal Emergency Management Agency*, United States District Court, Docket No. C11-2044 (RSM), 2014 WL 5449859 *1 (W.D. Wash. October 24, 2014); see also 44 C.F.R. § 59.2.

To carry out its mandate, the NFIA authorizes FEMA to "identify and publish information with respect to all flood plain areas, including coastal areas located in the United States, which have special flood hazards"[4] and to "establish or update flood-risk zone data in all such areas, and make estimates with respect to the rates of probable flood caused loss for the various flood risk zones for each of these areas . . . ." 42 U.S.C. § 4101 (a). That data then is memorialized on a flood insurance rate map, which is "an official map of a community, on which the Federal Insurance Administrator has delineated both the special hazard areas and the risk premium zones applicable to the community. . . ." 44 C.F.R. § 59.1. The present action concerns the mapping of flood prone areas in the defendant municipality.

The following facts are gleaned from the pleadings, affidavits, and other proof submitted, viewed in a light

most favorable to the plaintiff. See *Dubinsky* v. *Black*, 185 Conn. App. 53, 56, 196 A.3d 870 (2018). The defendant is a community, as that term is defined in the code,[5] that has participated in the National Flood Insurance Program since 1982, and thus is obligated to adopt adequate flood plain management regulations consistent with federal criteria. See 44 C.F.R. § 60.1. The defendant is also a mapping partner under FEMA guidelines for map modernization that helps "[ensure] the accuracy" of flood insurance rate maps prepared by FEMA.

At all relevant times, the plaintiffs owned real property known as 159 Lebanon Avenue in Colchester (property), an undeveloped parcel of vacant land. The property is located in an area that is designated as a flood zone on Flood Insurance Rate Map number 09011C0154G (map) prepared by FEMA and dated July 18, 2011. In light of that designation, the plaintiffs had a survey of the property performed, which indicated that the map incorrectly located a portion of Judd Brook on the property. As Wozniak averred in his July 14, 2017 affidavit, the survey confirmed that the map "incorrectly depicts the location of Judd Brook, resulting in our [p]roperty being wrongfully determined to be in a flood zone."

On April 4, 2012, Wozniak brought that alleged inaccuracy to FEMA's attention by submitting an application for a Letter of Map Amendment (LOMA).[6] That application consisted of a two page letter from Wozniak, in which he indicated that "[t]he property is for sale and buyers don't want to hear about flood plains and flood insurance," and attached three maps of the area in question. As Wozniak explained in his application, "[u]sing Photoshop, [he] approximated the actual course of Judd Brook and added notes" on one of those maps. By letter dated May 25, 2012, a FEMA official responded to Wozniak's LOMA application by requesting additional information.[7] There is no indication in the record before us that the plaintiffs ever responded to that request or provided any further documentation to FEMA in connection therewith.

The record also contains three letters sent to the plaintiffs from the defendant's First Selectman, Gregg Schuster, in the summer and fall of 2012. In his August 1, 2012 letter, Schuster stated: "Based on the [defendant's] review of the materials you submitted, specifically FEMA's May 25, 2012 letter of [r]eply regarding your LOMA application, it appears you have been asked to supply additional data in order for FEMA to continue processing your request. It does not appear that they are asking you to submit a [Letter of Map Revision (LOMR)] application. In any event, as was done for your LOMA application, if in fact you are required to file a LOMR, the [defendant's] Chief Executive Officer . . . would assist you to the extent of reviewing your application and signing a concurrence form contained within

your application. The [defendant] has done this for other private property LOMR applications in the past. However, all materials and maps required to complete the submission to FEMA are the private property owner's responsibility." In his September 7, 2012 letter, Schuster similarly stated that "[a]fter speaking with FEMA representatives, including Caitlin Clifford, who you recommended that we speak with, it is our understanding that as the property owner, there is no reason why you cannot continue with your LOMA application. Should you continue with your LOMA application, the [defendant] would be more than happy to assist you by giving you concurrence through the First Selectman's Office." In a third letter dated October 16, 2012, Schuster provided the plaintiffs detailed advice on how to prepare a "successful LOMA application."[8]

In the months that followed, the plaintiffs continued to furnish the defendant with various documentation regarding the apparent inaccuracy on the map. As they allege in their operative complaint: "On various dates between October of 2012 and January of 2013 the [p]laintiffs submitted to the [defendant] scientific data which showed . . . the existing [map] for the [property] and the adjacent property to be incorrect. Specifically, the [p]laintiffs' survey showed that Judd Brook Channel as shown on the [map] was not in fact in the location shown on the [map] and that it was not on the [property]. Plaintiffs through historical data and survey data demonstrated that the sluiceway was located on the abutting property and as a result the flood plain elevation for the [property] was incorrect. This incorrect depiction places a significant portion of the [property] in the flood plain when it is not. As a result of this error, a substantial, if not the entire portion, of the [property] is rendered unusable." The plaintiffs thus demanded that the defendant file a LOMR application with FEMA on their behalf to correct the map in question.

When the defendant declined to do so, this litigation ensued. The plaintiffs' operative complaint contains three counts. In the first, they seek a writ of mandamus to compel the defendant to file a LOMR application on their behalf to correct the alleged error on the map. The second count sounds in inverse condemnation, alleging that the defendant's failure to file a LOMR application "effectively resulted in a confiscation of the [p]roperty without compensation." In the third count, the plaintiffs alleged negligence on the defendant's part "in carrying out its obligations under the National Flood Insurance Program by failing to file a [LOMR] with FEMA." The defendants filed an answer, as well as a special defense to the third count of the complaint, on August 11, 2015. On August 18, 2016, the plaintiffs filed a certificate of closed pleadings, in which they requested a court trial.

The defendants thereafter filed a motion for summary

judgment, which was accompanied by several exhibits, including application forms and instructions for both LOMR and LOMA applications. In response, the plaintiffs filed an opposition, to which they attached copies of various correspondence and Wozniak's affidavit. The court heard argument from the parties on November 13, 2017. In its subsequent memorandum of decision, the court concluded that no genuine issue of material fact existed as to any of the three counts alleged in the complaint and that the defendant was entitled to judgment as a matter of law. Accordingly, the court rendered summary judgment in its favor. From that judgment, the plaintiffs now appeal.

I

As a preliminary matter, we address a question of mootness. Approximately ten months after the commencement of the present appeal, the defendant filed a motion to dismiss, in which it alleged that the plaintiffs' challenge to the court's ruling on their mandamus claim had been rendered moot by recent developments. Appended to that motion were copies of correspondence from FEMA officials who, in October, 2016, informed the defendant of a "new FEMA program" known as "Risk Mapping, Assessment, and Planning," or "Risk MAP," that was intended to help "communities identify, assess, and reduce their flood risk" by "combining quality engineering with updated flood hazard data . . . ." In implementing that new program, FEMA solicited "any data . . . [that the defendant] would like to have taken into consideration when reviewing [the defendant's] flood risk . . . ." The defendant's town engineer responded to that request by asking FEMA to review, inter alia, "the Flood Zone mapping on [the map] in the area of Judd Brook, North of Lebanon Avenue/State Route 16 for potential conflict between the flood limits/extents shown on the map and the actual flood limit elevations based on topography."[9] By letter dated October 17, 2018, a FEMA official notified the defendant it had completed the "discovery" portion of the Risk MAP program and had "selected" Judd Brook for a detailed study as part of its upcoming "engineering and mapping" activities.

The plaintiffs filed an objection to the motion to dismiss on December 3, 2018. Weeks later, they filed a supplement to the facts recited therein, in which the plaintiffs stipulated in relevant part that Judd Brook "will be reviewed [and] surveyed as part of the proposed field study" to be conducted by FEMA as part of the Risk MAP program. They nevertheless maintained that the pendency of that study did not render the present appeal moot. By order dated March 13, 2019, this court denied the defendant's motion to dismiss "without prejudice to the panel that hears the merits of the appeal considering the issues raised in the motion to dismiss." At oral argument before this court, the parties renewed

their respective claims, as set forth in the pleadings on the motion to dismiss.

The question of mootness implicates the subject matter jurisdiction of this court and thus "may be raised at any time . . . ." *State* v. *Charlotte Hungerford Hospital*, 308 Conn. 140, 143, 60 A.3d 946 (2013). "Mootness is a question of justiciability that must be determined as a threshold matter because it implicates [this] court's subject matter jurisdiction . . . . Because courts are established to resolve actual controversies, before a claimed controversy is entitled to a resolution on the merits it must be justiciable. . . . A case is considered moot if [the] court cannot grant the appellant any practical relief through its disposition of the merits . . . ." (Citations omitted; internal quotation marks omitted.) *JP Morgan Chase Bank, N.A.* v. *Mendez*, 320 Conn. 1, 6, 127 A.3d 994 (2015). "In determining mootness, the dispositive question is whether a successful appeal would benefit the plaintiff or defendant in any way." (Internal quotation marks omitted.) *Middlebury* v. *Connecticut Siting Council*, 326 Conn. 40, 54, 161 A.3d 537 (2017). Our review of the question of mootness is plenary. *State* v. *Rodriguez*, 320 Conn. 694, 699, 132 A.3d 731 (2016).

We agree with the plaintiffs that FEMA's pending field study of Judd Brook does not render the present appeal moot. As FEMA officials plainly indicated in the October, 2016 letter to the defendant, Risk MAP is a "new" program that is being implemented for the first time. Although the record before us, as supplemented by the materials appended to the defendant's motion to dismiss, indicates that implementation of the Risk MAP program in the lower Connecticut watershed began in November, 2016, the record is bereft of any indication as to when that program ultimately will conclude. In this regard, it bears emphasis that two years passed from the time that FEMA notified the defendant of implementation of the Risk MAP program in the lower Connecticut watershed to its announcement that Judd Brook had been selected for a detailed study during that program. Furthermore, in the October 17, 2018 letter to the defendant confirming that selection, the FEMA official cautioned the defendant that although field surveying "will be occurring during 2019," it was but one step in the Risk MAP program and that "[a]s this project continues, the [United States Geological Survey] will be conducting a number of other meetings with the stakeholders in the Lower Connecticut Valley Watershed to communicate the progress of the project and to solicit comments about draft and preliminary products." (Emphasis omitted.) In short, there is no indication in the record before us as to when the Risk MAP program will conclude and when any final determination regarding the delineation and designation of Judd Brook on the map will transpire.

Because the question of mootness implicates the subject matter jurisdiction of this court, we are obligated to indulge every reasonable presumption in favor of jurisdiction in resolving that issue. See *Mendillo* v. *Tinley, Renehan & Dost, LLP*, 329 Conn. 515, 523, 187 A.3d 1154 (2018); *Simes* v. *Simes*, 95 Conn. App. 39, 42, 895 A.2d 852 (2006). Guided by that fundamental precept, we cannot conclude, on the limited record before us, that the pending review of Judd Brook under the Risk MAP program necessarily deprives this court of the ability to provide the plaintiffs with any meaningful relief. Should they prevail in this appeal, the plaintiffs would secure an order of mandamus directing the defendant to submit a LOMR application on their behalf. That relief could well provide a more expeditious resolution of the mapping issue regarding their property than the ongoing Risk MAP program, whose terminal date remains unknown. For that reason, we conclude that the present appeal is not moot and turn our attention to the merits of the plaintiff's claim.

II

On appeal, the plaintiffs contend that the court improperly rendered summary judgment in favor of the defendant on their mandamus claim. We disagree.

The standard that governs our review of the trial court's decision to grant summary judgment is well established. "Practice Book § 17-49 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . [T]he moving party . . . has the burden of showing the absence of any genuine issue as to all the material facts . . . . When documents submitted in support of a motion for summary judgment fail to establish that there is no genuine issue of material fact, the nonmoving party has no obligation to submit documents establishing the existence of such an issue. . . . Once the moving party has met its burden, however, the [nonmoving] party must present evidence that demonstrates the existence of some disputed factual issue. . . . Our review of the trial court's decision to grant the defendant's motion for summary judgment is plenary." (Citations omitted; internal quotation marks omitted.) *Lucenti* v. *Laviero*, 327 Conn. 764, 772–73, 176 A.3d 1 (2018). "The test is whether the party moving for summary judgment would be entitled to a directed verdict on the same facts." (Internal quotation marks omitted.) *SS-II, LLC* v. *Bridge Street Associates*, 293 Conn. 287, 294, 977 A.2d 189 (2009).

In the present case, the plaintiffs seek a writ of man-

damus to compel the defendant to file a LOMR application on their behalf. Mandamus is an ancient common law writ "with deep roots in the American legal tradition . . . ." *Hennessey* v. *Bridgeport*, 213 Conn. 656, 658, 569 A.2d 1122 (1990); see also *Rapp* v. *Van Dusen*, 350 F.2d 806, 811–12 (3d Cir. 1965). It is an order directed at public officials that is injunctive in nature. 1 D. Dobbs, Law of Remedies (2d Ed. 1993) § 2.9 (1), p.226; see also *Hamblen* v. *Kentucky Cabinet for Health & Family Services*, 322 S.W.3d 511, 518 (Ky. App. 2010) (mandamus "is quintessentially injunctive in nature"); 2 E. Stephenson, Connecticut Civil Procedure (3d Ed. 2002) § 224 (a), p.565 (mandamus a prerogative writ designed to give state superintendence of activities of public officers). As our Supreme Court has emphasized, "[t]he writ of mandamus is an extraordinary remedy to be applied only under exceptional conditions, and is not to be extended beyond its well-established limits." *Lahiff* v. *St. Joseph's Total Abstinence Society*, 76 Conn. 648, 651, 57 A. 692 (1904); see also *Cook-Littman* v. *Board of Selectmen*, 328 Conn. 758, 767 n.9, 184 A.3d 253 (2018); *AvalonBay Communities, Inc.* v. *Sewer Commission*, 270 Conn. 409, 416–17, 853 A.2d 497 (2004).

"[M]andamus neither gives nor defines rights which one does not already have. It enforces, it commands, performance of a duty. It acts at the instance of one having a complete and immediate legal right; it cannot and it does not act upon a doubtful or a contested right . . . ." (Internal quotation marks omitted.) *Hennessey* v. *Bridgeport*, supra, 213 Conn. 659. Accordingly, "[a] party seeking a writ of mandamus must establish: (1) that the plaintiff has a clear legal right to the performance of a duty by the defendant; (2) that the defendant has no discretion with respect to the performance of that duty; and (3) that the plaintiff has no adequate remedy at law." (Internal quotation marks omitted.) *Stewart* v. *Watertown*, 303 Conn. 699, 711–12, 38 A.3d 72 (2012).

The plaintiffs claim that the defendant possesses a ministerial duty to file a LOMR application with FEMA on their behalf to rectify the allegedly improper designation of their property, as alleged in the operative complaint. In rendering summary judgment, the court concluded that no genuine issue of material fact existed to support such a duty on the part of the defendant. We agree.

A

Undisputed Facts

Critical to our analysis are certain facts that are not disputed by the parties. As the trial court noted in its memorandum of decision, a portion of the property has been designated in a flood area "since inception of the [map] and continues to be so designated. . . . [T]here

is no dispute that [sometime] prior to 2011, Judd Brook was diverted into piping on [an adjacent parcel to the south of the plaintiffs' property]. It is undisputed this diversion on the [adjacent] parcel did not affect the location of . . . Judd Brook on the plaintiffs' property [and that] the point of discharge following the rerouting of . . . Judd Brook did not change."[10]

The plaintiffs' claim, as set forth in their operative complaint and Wozniak's affidavit, is not that a physical change to Judd Brook transpired that affected their property. Rather, they claim that Judd Brook has been improperly depicted on a portion of their property since the map first was promulgated, which resulted in incorrect flood plain elevations on the property.[11] That "incorrect depiction," the plaintiffs allege, "places a significant portion of [the] property in the flood plain when it is not."

## B

### Relevant Federal Authority

It is well established that, in construing individual regulations, we do not read them in isolation, but rather in light of the entire act. See, e.g., *Historic District Commission* v. *Hall*, 282 Conn. 672, 684, 923 A.2d 726 (2007) ("Legislative intent is not to be found in an isolated sentence; the whole statute must be considered. . . . In construing [an] act . . . this court makes every part operative and harmonious with every other part insofar as is possible . . . ." [Citation omitted; internal quotation marks omitted.]). Notably, the NFIA requires FEMA to review flood maps once every five years to assess the need to update all flood plain areas and flood risk zones. See 42 U.S.C. § 4101 (e). In addition to that quinquennial requirement, communities that participate in the National Flood Insurance Program act as partners with FEMA to ensure the accuracy of its flood insurance rate maps. Under federal law, FEMA is authorized to revise and update those maps "upon the request from any State or local government stating that specific flood-plain areas or flood-risk zones in the State or locality need revision or updating, if sufficient technical data justifying the request is submitted . . . ." 42 U.S.C. § 4101 (f) (2).

The National Flood Insurance Program, which is codified at 44 C.F.R. § 59.1 et seq., specifies the manner by which communities may file a request with FEMA to revise a flood insurance rate map. The mandamus action now before us is predicated on the plaintiffs' contention that 44 C.F.R. §§ 65.3 and 65.7 impose a ministerial duty on the defendant to file a LOMR to rectify the incorrect depiction of their property on the map. For its part, the defendant acknowledges that, as a mapping partner, it is permitted to request revisions to flood insurance rate maps. It nonetheless maintains that federal law imposes no mandatory duty on munici-

palities to do so at the behest of a property owner. Our analysis, therefore, centers on the relevant provisions of the National Flood Insurance Program.

In considering those provisions, we note that "[a]dministrative regulations have the full force and effect of statutory law and are interpreted using the same process as statutory construction, namely, under the well established principles of General Statutes § 1-2z. . . . When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . [Section] 1-2z directs this court to first consider the text of the statute and its relationship to other statutes to determine its meaning. If, after such consideration, the meaning is plain and unambiguous and does not yield absurd or unworkable results, we shall not consider extratextual evidence of the meaning of the statute. . . . Only if we determine that the statute is not plain and unambiguous or yields absurd or unworkable results may we consider extratextual evidence of its meaning such as the legislative history and circumstances surrounding its enactment . . . the legislative policy it was designed to implement . . . its relationship to existing legislation and common law principles governing the same general subject matter . . . . The test to determine ambiguity is whether the statute, when read in context, is susceptible to more than one reasonable interpretation." (Citations omitted; internal quotation marks omitted.) *Sarrazin* v. *Coastal, Inc.*, 311 Conn. 581, 603–604, 89 A.3d 841 (2014); see also *Forest Watch* v. *United States Forest Service*, 410 F.3d 115, 117 (2d Cir. 2005) (applying plain meaning rule to interpretation of federal regulation); *Gianetti* v. *Norwalk Hospital*, 211 Conn. 51, 60, 557 A.2d 1249 (1989) (interpreting "agency regulations in accordance with accepted rules of statutory construction"); 1A N. Singer & J. Singer, Sutherland Statutory Construction (7th Ed. 2009) § 31:6, pp. 698–99 (observing that rules of statutory construction also govern interpretation of administrative regulations).

The National Flood Insurance Program provides distinct administrative mechanisms, known as LOMAs and LOMRs, to correct alleged inaccuracies on flood insurance rate maps. A LOMA is an administrative procedure intended to provide recourse to the "owner or lessee of property who believes his property has been inadvertently included" in a special flood hazard area or regulatory floodway when there has not been "any alteration of topography . . . ." 44 C.F.R. § 70.1. That procedure permits such an owner or lessee to "submit scientific or technical information" to FEMA, which is required to review that information and notify the applicant of its decision within sixty days. 44 C.F.R. §§ 70.3–70.4.

When FEMA determines that a particular property has been inadvertently included in a special flood hazard area or regulatory floodway, it issues a LOMA that specifies (1) the name of the municipality in which the property lies, (2) the number of the erroneous flood insurance rate map, and (3) the identification of the property to be excluded from the previous designation. 44 C.F.R. § 70.5. FEMA then distributes copies of the LOMA to various entities and publishes notice in the Federal Register when a change of base flood elevations has occurred. 44 C.F.R. §§ 70.6–70.7. LOMAs thus exist to "correct the inadvertent inclusion of properties in the regulatory floodway depicted on a [flood insurance rate map]." *Coalition for a Sustainable Delta* v. *Federal Emergency Management Agency*, 812 F. Supp. 2d 1089, 1124 (E.D. Cal. 2011).

By contrast, a request for a LOMR is "based on proposed or actual manmade alterations within the floodplain, such as the placement of fill; modification of a channel; construction or modification of a bridge, culvert, levee, or similar measure; or construction of single or multiple residential or commercial structures on single or multiple lots." 44 C.F.R. § 72.1. The code defines a LOMR in relevant part as "FEMA's modification to an effective Flood Insurance Rate Map . . . . LOMRs are generally based on the implementation of physical measures that affect the hydrologic or hydraulic characteristics of a flooding source and thus result in the modification of the existing regulatory floodway, the effective base flood elevations, or the [special flood hazard area]. . . ." 44 C.F.R. § 72.2. Unlike a LOMA, which is an official notice that a particular property should not be included in a special flood hazard area or regulatory floodway, the issuance of a LOMR by FEMA results in an official revision to the flood insurance rate map itself. Id. The plaintiffs' mandamus action concerns the defendant's alleged duty to file a LOMR application on their behalf pursuant to 44 C.F.R. §§ 65.3 and 65.7.

1

In their principal appellate brief, the plaintiffs contend that the defendant owed them a duty to "to initiate the LOMR process, as is mandated under 44 C.F.R. § 65.3." (Footnote omitted.) By its plain language, § 65.3 concerns physical changes to property. It provides: "A community's base flood elevations may increase or decrease resulting from *physical changes affecting flooding conditions*. As soon as practicable, but not later than six months after the date such information becomes available, a community *shall notify the Administrator of the changes* by submitting technical or scientific data in accordance with this part. Such a submission is necessary so that upon *confirmation of those physical changes affecting flooding conditions*, risk premium rates and flood plain management require-

ments will be based upon current data." (Emphasis added.) Section 65.3, therefore, plainly and unambiguously applies to situations involving physical changes affecting flooding conditions.

In the present case, it is undisputed that no physical change affecting flooding conditions has occurred with respect to the plaintiffs' property. Their claim, as memorialized in the operative complaint and Wozniak's July 14, 2017 affidavit, is that Judd Brook has been improperly depicted on a portion of their property since the map first was promulgated. See part II A of this opinion. The plaintiffs have made no factual allegation that their property has undergone any physical change or that it has been affected by a physical change to another property. Absent such allegations, the plaintiffs' claim that the defendant had a duty under 44 C.F.R. § 65.3 to file a LOMR application on their behalf is untenable. Because § 65.3 applies only when there are "physical changes affecting flooding conditions," there is no genuine issue of material fact regarding its inapplicability to the present case, in which the sole issue raised by the plaintiffs is the incorrect depiction of Judd Brook on their property.

Perhaps cognizant of that shortcoming, the plaintiffs have attempted to inject new factual allegations into the case for the first time on appeal. They allege in their principal appellate brief that the trial court's analysis "ignores entirely the fact that the relocation and underground piping of Judd Brook on the [adjacent] parcel changed the character of the floodway, which precipitated a change to the flow rate of the floodway, and has altered the floodplain, in which the plaintiffs' property is located." (Emphasis omitted.) The plaintiffs further allege that "the flooding on the [adjacent] parcel was caused by the removal of the dam for the Hayward Pond up-stream therefrom. The pond was a holding pond that flooded the area upstream. Removing it caused flooding downstream." Neither the operative complaint nor Wozniak's July 14, 2017 affidavit contains those allegations. Such allegations are patently improper, having never been raised in the pleadings before the trial court.[12] We therefore decline to consider them. See, e.g., *Schoonmaker* v. *Lawrence Brunoli, Inc.*, 265 Conn. 210, 249 n.46, 828 A.2d 64 (2003) (declining to consider claims raised for first time on appeal "because the plaintiffs never properly raised them in the trial court by pleading them in their complaint"); *Link* v. *Shelton*, 186 Conn. 623, 628, 443 A.2d 902 (1982) ("new facts alleged . . . for the first time on appeal" improper because they "were not part of the pleadings or affidavits below"); *Stevens* v. *Helming*, 163 Conn. App. 241, 246–48, 135 A.3d 728 (2016) (observing that "[i]n ruling on the defendants' motion for summary judgment, the court could consider only the facts alleged in the pleadings" and emphasizing that "[s]imple fairness requires that a defendant not be forced to

defend against facts that are not clearly pleaded in a complaint").

2

The plaintiffs also allege that 44 C.F.R. § 65.7 imposes a ministerial duty on the defendant to file a LOMR to correct the inaccurate depiction of Judd Brook on their property. We disagree.

Titled "Floodway revisions," 44 C.F.R. § 65.7 (a) provides in relevant part: "Floodway data is developed as part of FEMA Flood Insurance Studies and is utilized by communities to select and adopt floodways as part of the flood plain management program . . . . When it has been determined by a community that no practicable alternatives exist to revising the boundaries of its previously adopted floodway, the procedures below shall be followed. . . ." The section then proceeds to outline certain data and certification requirements, as well as the submission procedure for revision requests.

A prerequisite to the extraordinary relief afforded by a writ of mandamus is the existence of a duty that is ministerial in nature. As our Supreme Court has explained, "[i]t is axiomatic that [t]he duty [that a writ of mandamus] compels must be a ministerial one; the writ will not lie to compel the performance of a duty which is discretionary. . . . Consequently, a writ of mandamus will lie only to direct performance of a ministerial act which requires no exercise of a public officer's judgment or discretion. . . . Discretion is determined from the nature of the act or thing to be done . . . ." (Citations omitted; internal quotation marks omitted.) *AvalonBay Communities, Inc.* v. *Sewer Commission*, supra, 270 Conn. 422.

Here, the act or thing to be done is the determination by a community that "no practicable alternatives exist" to revising the boundaries of a previously adopted floodway. The act of determining whether any "practicable alternatives exist" is a quintessentially discretionary function, as it requires a community to exercise its judgment as to whether alternatives to revising such boundaries are practical in nature. As but one example, a community such as the defendant might reasonably conclude that the detailed study of Judd Brook that FEMA is conducting as part of the Risk MAP program in the lower Connecticut watershed is a practical alternative to the submission of a LOMR application pursuant to 44 C.F.R. § 65.7. Because § 65.7 imparts discretion on participating communities to evaluate whether any practical alternatives exist, we disagree with the plaintiffs that it is ministerial in nature.

We also are mindful that individual regulations are not to be construed in isolation, but rather in light of the entire act. See *Historic District Commission* v. *Hall*, supra, 282 Conn. 684. The code expressly indicates that requests for LOMRs are predicated on "proposed

or actual manmade alterations within the floodplain"; 44 C.F.R. § 72.1; and are "based on the implementation of *physical measures* that affect the hydrologic or hydraulic characteristics of a flooding source and thus *result in the modification of the existing regulatory floodway*, the effective base flood elevations, or the [special flood hazard area]. . . ." (Emphasis added.) 44 C.F.R. § 72.2. Section 65.7, in turn, plainly and unambiguously concerns "changes" to floodways. See 44 C.F.R. § 65.7 (b) ("[d]ata requirements when base flood elevation changes are requested"); 44 C.F.R. § 65.7 (c) ("[d]ata requirements for changes not associated with base flood elevation changes"); 44 C.F.R. § 65.7 (e) ("[a]ll requests that involve changes to floodways shall be submitted to the appropriate FEMA Regional Office"). As discussed in part II B 1 of this opinion, the plaintiffs have not alleged any manmade alterations or physical changes affecting their property or the designation thereof in their operative complaint. Their claim is that Judd Brook has been incorrectly depicted on their property since the flood insurance rate map for the area first was promulgated. Accordingly, 44 C.F.R. § 65.7 is inapposite to the present case. We therefore conclude that no genuine issue of material fact exists as to whether the defendant had a ministerial duty to file a LOMR application on behalf of the plaintiffs in the present case.

III

The plaintiffs' claim suffers a further infirmity. To obtain a writ of mandamus, the plaintiffs also must demonstrate that they have no adequate remedy at law. *Stewart* v. *Watertown*, supra, 303 Conn. 711–12. The plaintiffs have neither alleged in their operative complaint nor provided any evidence that property owners are precluded from filing LOMR applications with FEMA.

A review of the regulatory scheme governing the LOMR application process indicates otherwise. Part 72 of the National Flood Insurance Program sets forth the procedures that govern LOMR applications. See 44 C.F.R. § 72.1. Section 72.4 of chapter 44 of the code specifies submittal and payment procedures for LOMR applications. In particular, § 72.4 (e) provides: "The entity that applies to FEMA through the local community for review is responsible for the cost of the review. The local community incurs no financial obligation under the reimbursement procedures of this part *when another party* sends the application to FEMA."[13] (Emphasis added.) Thus, the National Flood Insurance Program plainly envisions the filing of LOMR applications by parties other than local communities such as the defendant. In such instances, it is that other party— and not the local community—that bears the financial burden that accompanies the filing of a LOMR application.

The instructions provided by FEMA for completing LOMR applications, which the defendant submitted in support of its motion for summary judgment, further demonstrate that property owners are permitted to file LOMR applications. FEMA's "Instructions for Completing the Application Forms for Conditional Letters of Map Revision and Letters of Map Revision" state in relevant part that "[s]ubmissions to [FEMA] for revisions to . . . [f]lood [i]nsurance [r]ate [m]aps . . . by *individual* and community requesters will require the signing of application forms." (Emphasis added.) Those instructions explain that LOMR applications must include the submission of a "concurrence form" that "requires the signatures of the requester, community official, and engineer." As the instructions expressly indicate, the manifest purpose of the concurrence form is to "ensure that the community is aware of the impacts of the [LOMR] request . . . ." For that reason, the instructions require the concurrence form to be signed by both the "[r]evision [r]equester"[14] and "the [chief executive officer] for the community involved in [the requested] revision . . . ." The requirement that an applicant seeking a LOMR obtain the concurrence of the community in which the property in question resides is further evidence that the National Flood Insurance Program envisions applicants other than local communities.

The case law from various jurisdictions is replete with examples in which individual property owners have applied for, and obtained, LOMRs from FEMA. See, e.g., *McCrory* v. *Administrator of Federal Emergency Management Agency*, 22 F. Supp. 3d 279, 284–85 (S.D.N.Y. 2014) (noting that LOMRs exist to permit "individuals, organizations and municipalities to request a localized update" to flood insurance rate maps and stating that individual property owners in that case "applied for the LOMR" and "FEMA approved the application"), aff'd, 600 Fed. Appx. 807 (2d Cir. 2015); *National Wildlife Federation* v. *Federal Emergency Management Agency*, supra, 2014 WL 5449859 *16 (explaining that "property owners" may "apply for a LOMR from FEMA"); *Somers Mill Associates, Inc.* v. *Fuss & O'Neill, Inc.*, Superior Court, judicial district of New Britain, Docket No. X03-CV-00-0503944 (March 7, 2002) (noting that FEMA issued LOMR to resolve discrepancy in flood insurance rate map in response to "a request initiated" by plaintiff property owners), aff'd sub nom. *Ahearn* v. *Fuss & O'Neill, Inc.*, 78 Conn. App. 202, 826 A.2d 1224, cert. denied, 266 Conn. 903, 832 A.2d 64 (2003); *Samuel's Furniture, Inc.* v. *Washington Dept. of Ecology*, 147 Wn.2d 440, 446, 54 P.3d 1194 (2002) ("Although the [local municipality] believed that the project was not within the shoreline jurisdiction, it suggested that [the plaintiff property owner] obtain a [LOMR] from FEMA to remove the portion of [the plaintiff's] property at issue from the FEMA floodway designation. [The individual property owner] sought and

obtained the LOMR, thus removing the property from the FEMA floodway."). In addition, the record before us contains copies of correspondence between the defendant's First Selectman and Wozniak, in which the First Selectman expressly indicated that the defendant had filed concurrence forms "for other private property LOMR applications in the past." The First Selectman further advised Wozniak that, in the event that the plaintiffs filed a LOMR application on their own behalf, the defendant would provide assistance by reviewing the application and signing a concurrence form.

The plaintiffs have presented no basis on which this court reasonably could conclude that an individual property owner is prohibited, as a matter of federal administrative law, from filing a LOMR application with FEMA. The relevant federal regulations and the materials submitted in connection with the motion for summary judgment all contemplate such filings by property owners, and the case law reflects that property owners routinely apply for and secure LOMRs from FEMA. The availability of that legal remedy, which would provide the plaintiffs the very relief they seek, is fatal to their mandamus action. See *Sterner* v. *Saugatuck Harbor Yacht Club, Inc.*, 188 Conn. 531, 534, 450 A.2d 369 (1982) ("for mandamus to lie, the plaintiff must have no other adequate remedy"); 55 C.J.S., Mandamus § 7 (2009) ("mandamus is used sparingly . . . and only when it is the sole available remedy"). We therefore conclude that the trial court properly rendered summary judgment in favor of the defendant in the present case.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] For purposes of clarity, we refer to Victor A. Wozniak and Olga E. Wozniak collectively as the plaintiffs and to Victor A. Wozniak individually by his surname.

[2] The plaintiffs also claim that the court improperly rendered summary judgment in favor of the defendant on their inverse condemnation and negligence claims. On appeal, the plaintiffs concede that the viability of those claims is wholly dependent upon their mandamus claim, as they are premised on the defendant's alleged duty "to submit an application to correct the flood map." In light of our resolution of the plaintiffs' principal claim, we agree with the plaintiffs that their inverse condemnation and negligence claims necessarily must fail. We, therefore, do not consider those claims in any detail.

[3] See 42 U.S.C. § 4001 et seq.

[4] The Code of Federal Regulations (code) defines "[a]rea of special flood hazard" as "the land in the flood plain within a community subject to a 1 percent or greater chance of flooding in any given year." 44 C.F.R. § 59.1. It defines "[f]lood plain or flood-prone area" in relevant part as "any land area susceptible to being inundated by water from any source . . . ." Id. We further note that the term "flood plain" is spelled as both one word and as two words in federal authorities. See, e.g., 42 U.S.C. § 4101; 44 C.F.R. § 59.1.

[5] The code defines "community" in relevant part as "any State or area or political subdivision thereof . . . which has authority to adopt and enforce flood plain management regulations for the areas within its jurisdiction." 44 C.F.R. § 59.1.

[6] The record also indicates that, on March 27, 2012, the defendant's First Selectman, Gregg Schuster, signed a community acknowledgement form for the plaintiffs' LOMA submission.

[7] In that correspondence, the FEMA official informed Wozniak that certain

"forms or supporting data, which were omitted from your previous submittal, must be provided: The metes and bounds description that was previously submitted includes a portion of the Judd Brook. Portion of streams/brooks cannot be removed from the Special Flood Hazard Area. Please revise the metes and bounds area to only include land. All corrections must be certified by a licensed land surveyor or professional engineer. If the updates to the metes and bounds area changes the lowest lot elevation provided on the elevation form, the form should be updated as well. If the lowest lot elevation does not change please provide a certified letter from the surveyor or engineer that completes the new map and description stating such. Please note that if all of the required items are not submitted within 90 days of the date of this letter, any subsequent request will be treated as an original submittal and will be subject to all submittal procedures." (Emphasis omitted.)

[8] More specifically, Schuster stated in relevant part: "Upon reviewing the submitted documentation and telephone conversation with town staff with [FEMA representative Caitlin Clifford] the following procedure is recommend[ed] for a successful LOMA application.

"1. The depicted limits of the flood zone should be a curvature-linear line that shows the elevation of the floodway as the actual topography of the site as it exists in comparison to the established floodway elevations as determined by the FEMA mapping. This area must not encroach upon the actual (field determined) location of Judd Brook or any back water areas below the established flood plain elevation. It also [is] recommended that both sides of the existing Judd Brook be more clearly defined on the submitted mapping, with topographic information shown for the complete affected area. The information must be submitted with a Licensed Land Surveyor's certification.

"2. Once the mapping is revised, the submission to Ms. Clifford should indicate that the information submitted involves field verified and determined topographic information and should be referred to her supervisor that is an engineer for evaluation. This was noted in the telephone conversation with Ms. Clifford that her 'authority' and limits of evaluation are simply map overlay and that sites that require determination of topographic information are conducted at the supervisory level above her.

"This should provide the most expedient process for the successful determination of your LOMA [a]pplication. Should you continue with your LOMA application, the [defendant] would be more than happy to assist you by giving you concurrence through the First Selectman's Office."

[9] The plaintiffs' property lies north of Lebanon Avenue/State Route 16.

[10] As Wozniak stated in his July 14, 2017 affidavit, "Judd Brook had been relocated years ago such that it is not located where it is as shown on the [map]. . . . Judd Brook to the south was rerouted by being place[d] in [reinforced concrete] pipe *but this did not affect its location on our property*." (Emphasis added.)

[11] As the plaintiffs note in their appellate reply brief, they "do not dispute that the location of Judd Brook as shown on the [map] has always been incorrect . . . ."

[12] In this regard, we note that the plaintiffs had ample opportunity to refine their factual allegations, having filed their original complaint on March 11, 2013, their first amended complaint on May 15, 2015, and the operative complaint—their second amended complaint—on July 21, 2015, the latter of which was in response to a request to revise filed by the defendant.

[13] Section 72.4 (h) (1) likewise obligates FEMA to "[n]otify *the requester and the community* within 60 days as to the adequacy of the submittal . . . ." (Emphasis added.)

[14] FEMA's "Instructions for Completing the Overview & Concurrence Form" state that the revision requester "should *own the property* involved in the request or have legal authority to represent a group/firm/organization or other entity in legal actions pertaining to the [National Flood Insurance Program]." (Emphasis added.)