******************************************************

The "officially released" date that appears near the
beginning of an opinion is the date the opinion will be
published in the Connecticut Law Journal or the date it
is released as a slip opinion. The operative date for the
beginning of all time periods for the filing of postopin-
ion motions and petitions for certification is the "offi-
cially released" date appearing in the opinion.

All opinions are subject to modification and technical
correction prior to official publication in the Connecti-
cut Law Journal and subsequently in the Connecticut
Reports or Connecticut Appellate Reports. In the event
of discrepancies between the advance release version of
an opinion and the version appearing in the Connecti-
cut Law Journal and subsequently in the Connecticut
Reports or Connecticut Appellate Reports, the latest
version is to be considered authoritative.

The syllabus and procedural history accompanying
an opinion that appear in the Connecticut Law Jour-
nal and subsequently in the Connecticut Reports or
Connecticut Appellate Reports are copyrighted by the
Secretary of the State, State of Connecticut, and may
not be reproduced or distributed without the express
written permission of the Commission on Official Legal
Publications, Judicial Branch, State of Connecticut.

******************************************************

ALDIN ASSOCIATES LIMITED PARTNERSHIP *v.*
STATE OF CONNECTICUT ET AL.
(AC 46504)

Bright, C. J., and Seeley and Bishop, Js.

*Syllabus*

The plaintiff appealed from the judgment of the trial court denying its request
for a writ of mandamus to compel the defendants, the state of Connecticut
and the Commissioner of Energy and Environmental Protection, to make
payment on the plaintiff's claims under the act (§ 22a-449a et seq.) establish-
ing an underground storage tank petroleum cleanup fund. The plaintiff
claimed, inter alia, that the court improperly failed to shift the burden of
proof to the defendants. *Held*:

The trial court did not exceed the scope of this court's remand in the
plaintiff's prior appeal, *Aldin Associates Ltd. Partnership* v. *State* (209
Conn. App. 741), when it held the plaintiff to its burden of establishing its
entitlement to a writ of mandamus.

The trial court did not abuse its discretion in denying the plaintiff's request
for a writ of mandamus directing the defendants to pay the plaintiff's
approved claims under the act, the plaintiff having failed to demonstrate
the existence of a clear legal right to be paid what it claims is due and
owing from the commissioner under the act.

This court declined the plaintiff's request to impose onto the act a burden
shifting requirement for the defendants to establish the existence of any
pending claims in the program after the plaintiff has made an initial showing
that there were sufficient funds in the program to pay its claims, as the
plaintiff failed to make such an initial showing regarding sufficient funds,
the plaintiff did not point to any authority or legislative history of the
statutory scheme that would support the imposition of a burden shifting
requirement onto the act, and sanctioning such burden shifting would clearly
expand the writ of mandamus beyond its well established limits.

(*One judge concurring in part and dissenting in part*)

Argued October 17, 2024—officially released January 21, 2025

*Procedural History*

Action seeking a writ of mandamus to compel the
defendants to adjudicate and make payment on the
plaintiff's claims in connection with the state's under-
ground storage tank petroleum cleanup program, and
for other relief, brought to the Superior Court in the

judicial district of Hartford, where the court, *Hon. Robert B. Shapiro*, judge trial referee, granted the defendants' motion to dismiss and rendered judgment thereon; thereafter, the plaintiff appealed to this court, *Bright, C. J.*, and *Moll* and *Harper, Js.*, which reversed in part the trial court's judgment and remanded the case to the trial court for further proceedings; subsequently, the plaintiff withdrew the portion of its application seeking to compel the defendants to adjudicate its claims, and the court, *Sicilian, J.*, rendered judgment for the defendants on the remaining portion of the plaintiff's complaint, from which the plaintiff appealed to this court. *Affirmed.*

*Richard P. Weinstein*, with whom, on the brief, was *Sarah Black Lingenheld*, for the appellant (plaintiff).

*Daniel M. Salton*, assistant attorney general, with whom, on the brief, was *William Tong*, attorney general, for the appellees (defendants).

*Opinion*

SEELEY, J. The plaintiff, Aldin Associates Limited Partnership, which owns and operates gas stations where underground storage tanks for petroleum have been used, appeals from the judgment rendered by the trial court denying its request for a writ of mandamus against the defendants, the state of Connecticut and Katie Dykes, the Commissioner of Energy and Environmental Protection (commissioner), directing them to request the state comptroller (comptroller) to pay the plaintiff's approved applications that were submitted pursuant to an underground storage tank petroleum clean-up program administered by the defendants. On appeal, the plaintiff claims that the court improperly (1) denied its request for a writ of mandamus and (2) failed to shift the burden of proof to the defendants. We disagree with both claims and affirm the judgment of the court.

The following facts and procedural history were set forth by this court in a prior appeal in this matter or are undisputed in the record. "In 1989, the General Assembly enacted legislation titled 'An Act Concerning Underground Storage Tanks' (act), which established the underground storage tank petroleum clean-up fund (fund). See Public Acts 1989, No. 89-373 (P.A. 89-373), codified as amended at General Statutes (Rev. to 1991) § 22a-449a et seq. Initially, the act provided that the fund shall be credited one third of the tax imposed on gross earnings derived from the sale of petroleum products under General Statutes § 12-587 and that the fund is to be used by the commissioner to reimburse responsible parties for costs incurred in remediating leaking underground storage tanks.[1] See P.A. 89-373, §§ 3, 4 and 10. A responsible party could apply to the clean-up fund review board (board) for reimbursement from the fund. See P.A. 89-373, §§ 7 and 10.

"The act was amended several times during the years following its enactment in 1989. In 1994, the legislature replaced the fund with the underground storage tank petroleum clean-up account (account). See Public Acts 1994, No. 94-130, § 6. In 2009, the General Assembly repealed General Statutes § 22a-449b, which required that a portion of tax revenue collected under § 12-587 be deposited in the account, and replaced the account with the underground storage tank petroleum clean-up program (program) to reimburse responsible parties

---

[1] "A responsible party is 'any person who . . . at any time owns, leases, uses or has an interest in the real property on which an underground storage tank system is or was located from which there is or has been a release or suspected release, regardless of when the release or suspected release occurred, or whether such person owned, leased, used or had an interest in the real property at the time the release or suspected release occurred, or whether such person owned, operated, leased or used the underground storage tank system from which the release or suspected release occurred . . . .' General Statutes § 22a-449a (3) (B)." *Aldin Associates Ltd. Partnership* v. *State*, 209 Conn. App. 741, 744 n.1, 269 A.3d 790 (2022).

'within available appropriations . . . .' Public Acts, Spec. Sess., June, 2009, No. 09-3, §§ 423 and 513, codified at General Statutes (Supp. 2010) § 22a-449c.

"In 2012, the General Assembly replaced the board with the commissioner and cancelled the program. See Public Acts, Spec. Sess., June, 2012, No. 12-1, §§ 252 and 262, codified at General Statutes §§ 22a-449c and 22a-449s. General Statutes § 22a-449t established deadlines for applicants to apply for reimbursement under the program based on the applicant's status as a municipal, small station, mid-size station, large station, or other applicant. Section 261 of Public Act 12-1, which was codified at General Statutes (Rev. to 2013) § 22a-449r, established a reverse auction system. This system was applicable 'to all applications submitted by mid-size or large station applicants before, on or after June 15, 2012, including, but not limited to, applications for which payment or reimbursement has been ordered by the commissioner but has not been made. . . .' General Statutes § 22a-449r (c) (2)."[2] (Footnote in original.) *Aldin Associates Ltd. Partnership* v. *State*, 209 Conn. App. 741, 744–45, 269 A.3d 790 (2022) (*Aldin I*).

When the legislature cancelled the program in 2012 and indicated that no more applications would be accepted after October 1, 2014, it also changed how the program was funded. The program would no longer be funded by a tax; rather, the legislature authorized the issuance of bonds in the total aggregate amount of $36 million for the purpose of providing payment or reimbursement ordered by the commissioner pursuant to the program. See General Statutes § 22a-449u. The $36 million in bond funds were divided equally, with

---

[2] In light of the language in § 22a-449r making it applicable to "all applications submitted . . . before, on or after June 15, 2012"; General Statutes § 22a-449r (c) (2); the plaintiff's mandamus claim is governed by the current version of the act. See *Aldin Associates Ltd. Partnership* v. *State*, 209 Conn. App. 741, 766 n.5, 269 A.3d 790 (2022).

$9 million allocated to each of the four categories of applicants. In addition to the change in funding for the program, the legislature also implemented a reverse auction system, which was a new system for how payments to applicants in categories three and four for mid-size and large stations would be prioritized. "Under the reverse auction system, 'priority for payment or reimbursement shall be given to those applicants who . . . agree to accept the greatest reduction in the amount ordered for payment or reimbursement by the commissioner under the program . . . .' General Statutes § 22a-449r (c) (4). Section 22a-449r (c) (2) (A) provides in relevant part: 'In the fiscal year beginning July 1, 2012, no payment shall be made to mid-size station applicants in excess of thirty-five cents on each dollar the commissioner orders to be paid or reimbursed under the program. In the fiscal year beginning July 1, 2013, and each fiscal year thereafter, such amount shall increase by ten cents on each dollar per fiscal year and in such years no payment or reimbursement shall be made in excess of the amount in effect for such fiscal year. . . .'

"The plaintiff owns and operates more than five gasoline facilities where underground storage tanks used for petroleum products are located and, therefore, is a responsible party and a mid-size station applicant under the act.[3] The plaintiff remediated some of its properties pursuant to the act and submitted several applications to the Department of Energy and Environmental Protection [(department)] seeking reimbursement for the costs it incurred. At the time the plaintiff commenced

---

[3] "General Statutes § 22a-449a (10) defines " '[m]id-size station applicant'" as 'an applicant who owned, operated, leased, used, or had an interest in, at the time such applicant's first application was received by the underground storage tank petroleum clean-up program, six to ninety-nine separate parcels of real property, within or outside of the state, on which an underground storage tank system was or had been previously located . . . .' " *Aldin Associates Ltd. Partnership* v. *State*, supra, 209 Conn. App. 746 n.2.

this action, some of the plaintiff's applications had been approved and paid, at least one application had been approved in 2009 but remained unpaid, and the commissioner had failed to act on the plaintiff's remaining applications.

"In 2019, the plaintiff brought this action against the defendants, claiming that the commissioner has unduly and unreasonably delayed the processing and payment of its applications for reimbursement under the program." (Footnote in original.) *Aldin Associates Ltd. Partnership* v. *State*, supra, 209 Conn. App. 745–46. In this action, the plaintiff initially sought a writ of mandamus ordering the commissioner " 'to pay approved claims and to adjudicate those pending claims [that] have not been adjudicated.' " Id., 746. The plaintiff also sought monetary damages on the basis of its allegations that the commissioner "failed to reimburse it and failed to administer the program within a reasonably timely manner as required by the act . . . violated the equal protection clause under article first, § 20, of the Connecticut constitution . . . violated the due process clause under article first, § 10, of the Connecticut constitution . . . [and] violated the takings clause of article first, § 11, of the Connecticut constitution." Id., 746–47.

The defendants filed a motion to dismiss the action for lack of subject matter jurisdiction, asserting that the plaintiff's claims were barred by sovereign immunity. Id., 747. Following a hearing, the trial court granted the defendants' motion to dismiss as to all counts, and the plaintiff appealed to this court, which affirmed the judgment in part as to the dismissal, on the ground of sovereign immunity, of all counts except for count one seeking a writ of mandamus. With respect to the mandamus count, this court concluded that it was not barred by sovereign immunity and remanded the case for further proceedings on that count. Id., 743–44, 779.

Following our remand, the plaintiff filed a single count, amended complaint seeking a writ of mandamus "ordering the commissioner to request the [comptroller] to make payments for [the plaintiff's] approved claims . . . ."[4] In its amended complaint, the plaintiff alleges that, in response to the legislation encouraging those responsible for facilities with underground storage tanks to identify and remediate all such facilities, "[t]he plaintiff engaged in an aggressive program to identify its applicable facilities, proceed[ed] with remediation of such facilities, and filed applications for reimbursement of the costs for such remediation pursuant to the statute. At least one of the unpaid applications was approved as early as 2009 in the amount of $532,443.34, yet has not been paid. . . . Recently, all of the plaintiff's applications have been processed and approved for payment in the amount of $1,720,880.56; therefore, there remains $2,253,323.96 due and owing." The plaintiff further alleges in its amended complaint that the defendants have unduly and unreasonably delayed processing applications and making payments for approved ones, including those of the plaintiff, which, in response to the state's changes to the program in 2012, elected a 95 percent reimbursement rate.

A trial on the mandamus count was held before the court on February 15, 2023. Paula McDowell, an employee of the department to whom the commissioner had delegated authority to approve applications under the program, was the only witness who testified. The plaintiff submitted as full exhibits documentary evidence concerning the amount of money in the fund, as well as the status of unpaid or unapproved applications. The parties also submitted pretrial and posttrial briefs.

---

[4] After this court's decision in *Aldin I*, the commissioner approved the plaintiff's remaining applications for reimbursement in the amount of $2,253,323.96. Consequently, the plaintiff's amended complaint removed the request for a writ of mandamus ordering the commissioner to adjudicate its pending claims.

McDowell testified that she is the person who currently reviews applications and decides whether an application should be approved. The plaintiff's counsel questioned her extensively regarding the plaintiff's exhibit one, a document she had produced outlining the status of outstanding applications and available funds for the program. For each category of claimants, the document shows the number of existing claims that are deemed new, supplemental, tabled, or awarded but not paid, and for each of those types of claims, it shows the total dollar amount.[5] When asked about a number

[5] Specifically, for the first category, "municipalities and other applicants," there are no new claims, there are four supplemental claims totaling $137,260.59, there is one tabled claim in the amount of $21,984.97, and there are no awarded but not paid claims. With respect to the tabled claim, McDowell testified that it was a clerical error and that the claim should not have been listed. Thus, taking that into account, the total amount of outstanding claims for municipalities and other applicants is $137,260.59, as opposed to the $159,245.56 reflected on the document. For the second category, "small station owners," there are two new claims totaling $18,872.32, two supplemental claims totaling $46,674.82, thirteen tabled claims totaling $543,349.06, and two awarded but not paid claims totaling $12,855.46. The total amount of outstanding claims for small station owners is $621,751.66. As for the third category, "mid-size station owners," there are no new claims, fourteen supplemental claims totaling $577,041.30, five awarded but not paid claims totaling $552,114.54, and six tabled claims totaling $458,047.10, with a notation stating: "Alliance [Energy] claim for $342,163.16 has a reduce[d] ele[c]tion for [thirty-five] cents." The document lists the total amount of outstanding claims for mid-size station owners as $1,587,202.94, which, we note, is less than the $2,253,323.96 in approved claims for which the plaintiff is seeking payment. Finally, as for the fourth category, "large station owners," there are 51 new claims totaling $6,378,146.93, 1149 supplemental claims totaling $52,841,691.31, 87 tabled claims totaling $1,663,028.92, and 234 awarded but not paid claims totaling $3,194,687.31. The total amount of outstanding claims for large station owners is $64,077,554.47. In all, pursuant to exhibit one, there are 1570 claims across the categories seeking reimbursement from the fund, totaling more than $66 million.

The plaintiff also submitted into evidence exhibit eight, which McDowell had provided to the plaintiff as an update to the status of the various claims. Exhibit eight, however, does not include "awarded but not paid" claims, which McDowell testified were mistakenly omitted from the document. After accounting for that omission, there are no substantial differences between the amounts in the two documents. For municipalities and other

of the claims in the various categories, McDowell acknowledged that no action has been taken on many of them in the past ten years and that she has not done anything to follow up on any of the tabled or supplemental applications or to pursue any missing documentation in order to resolve any of those claims. She also testified that no other station owners in the various categories have brought an action seeking to recover on any of the outstanding applications and that there has been no action taken, other than by the plaintiff, in category three with respect to any of the outstanding applications. When asked whether there are "any other applicants in mid-size [category three] that have approved claims that weren't paid, with the exception of [a claim by a company called Alliance Energy]," she responded: "Yes, there's some claims that have bankruptcy issues that were awarded but not paid." She also testified regarding a number of claims by various companies for which "insurance issues" were noted, acknowledging that those issues have not been resolved.

At one point during the direct examination of McDowell, the plaintiff's counsel asked: "As of today, even though there's approximately $2.7 million available, you have not instructed the comptroller to pay [the plaintiff's] approved claims, correct?" McDowell responded that that was correct, and when asked further if she had any intention of doing so "unless the court orders it," she replied, "[t]here's no money available to pay them." On cross-examination, she testified that the total

applicants, after accounting for the previously mentioned clerical error as reflected in exhibit one, the amount for one tabled application is now $107,668.09. For small and mid-size station owners, the amounts have not changed. There is a new notation, however, stating: "[The plaintiff's] pending approved claims to be paid of $1,907,074.73 has a reduction of [ninety-five] cents." As for large station owners, there is one fewer tabled application, which reduced the total amount by $107,688.09. There still remains more than $65 million in outstanding claims.

amount of unpaid claims is more than $65 million. She further testified that the plaintiff is not first in line to be paid for mid-size station owners, which category has only $4310 remaining in the account for that category.

After the conclusion of the trial, the court issued a memorandum of decision in which it denied the plaintiff's request for a writ of mandamus. On the basis of the evidence presented, the court made the following findings. "The plaintiff [a mid-size applicant under the act] made multiple claims for reimbursement from the [fund] and received reimbursement for many such claims. The plaintiff made, and the commissioner approved, additional claims for reimbursement totaling $2,253,323.96. Those approved claims have not been paid.

"The total amount remaining in the [fund] is $2,750,953. That amount is allocated among the four categories of applicants established by the act as follows: $445,734.35 is allocated for municipal and other applicants; $1,853,003.[3]8 is allocated for large applicants; $447,904.69 is allocated for small applicants; [and] $4310.58 is allocated for mid-size applicants.

"Numerous claims, made by claimants other than the plaintiff, remain pending before the commissioner unadjudicated, tabled, or approved but not paid. The total of all such claims vastly exceeds the total amount remaining in the [fund].

"During 2019, [McDowell], an employee of [the department] to whom the commissioner has delegated substantial discretion to manage the processing and disposition of claims under the act, made the discretionary decision to reallocate funds from other categories into the mid-size category so that some approved claims of the plaintiff could be paid.[6] That reallocation was

---

[6] Specifically, McDowell testified that, in 2019, in her discretion she moved a little more than $7 million to the mid-size category specifically to pay many of the plaintiff's claims, which resulted in a payment to the plaintiff

made notwithstanding that there were pending claims in at least some of the categories from which funds were taken that exceeded the amounts then allocated to those categories.

"Other than reallocating funds and paying some of the plaintiff's claims in 2019, the [commissioner] has taken little or no action to process, resolve or pay outstanding claims for more than ten years. None of the applicants, other than the plaintiff, has taken any action to pursue its applications or payment of its approved claims." (Footnote added; footnotes omitted.) The court also noted that it was unclear from the record "the extent to which the commissioner has taken any action at all to process claims, other than the plaintiff's claims, in the past ten years. McDowell, who has had responsibilities for the program since the program's inception, answered 'yes' when asked whether there had been processing to finalize claims in the large station category over the last ten years. Counsel did not inquire further and so there is no evidence that more completely explains McDowell's affirmative answer. In response to other questions, McDowell confirmed that . . . little or nothing [has been done] to process or resolve outstanding applications and claims. For example, she indicated that . . . nothing [has been done] to follow up on applications that were tabled, or supplemental claims that were filed, in 2012 or earlier, nothing

of $11 million. At oral argument before this court, the defendants' counsel explained that, prior to our decision in *Aldin I*, the commissioner believed that she had discretion to manage the fund and to move funds between categories, despite the statutory language establishing the order in which claims must be paid. Counsel also acknowledged, however, that in light of this court's decision in *Aldin I*, no such discretion to manage the fund exists.

As a result of that payment in 2019, the plaintiff ultimately received $2 million more than the $9 million designated for mid-size station owners. In all, the plaintiff has filed 435 applications for reimbursement from the fund, of which 413 have been paid. In fact, the plaintiff has been paid $19 million in total from the fund to date and is the single largest payee of the fund since its closure.

[has been done] to pursue claims that were affected by the bankruptcy of claimants that occurred some ten years ago or more, and nothing [has been done] to resolve what McDowell described as 'insurance issues' relating to claims that date back more than ten years."

The court next addressed the parties' disagreement as to the scope of the remand from this court: "[T]he plaintiff argue[d] that the only issue for [the] court to determine [was] whether there are available funds to pay the plaintiff's approved claims," while "the defendants contend[ed] that the remand leaves open for determination more issues than just the availability of funds to pay approved claims . . . ." It concluded that, even under "the plaintiff's narrow interpretation of the remand order, the plaintiff ha[d] failed to establish entitlement to a writ of mandamus ordering the commissioner to request the comptroller to pay the plaintiff's approved claims." In reaching that determination, the court noted the plaintiff's reliance on § 22a-449r (a) (1), which allows for available funds to be divided among the four categories of claimants and provides in relevant part: "If at any time there is an amount remaining in one such category and if in such category there are no pending applications or applications for which payment or reimbursement has been ordered by the commissioner but has not been made . . . then such amount shall be redistributed for payment or reimbursement in the following order of priority . . . ." The court then stated: "The amount currently allocated to the mid-size category in which the plaintiff belongs is only $4310.58. The plaintiff acknowledges that, to pay the plaintiff's approved claims, the commissioner would have to move funds from other categories into the mid-size category. The evidence makes clear, and the court finds, that there are tens of millions of dollars in applications in some state of processing, including claims approved but unpaid, pending before the commissioner. The evidence

also demonstrates, and the court finds, that the plaintiff's claims are not first in line for payment under the 'reverse auction' protocol established for the mid-size category under the statute. The plaintiff's claim that there are available funds to pay its approved claims therefore rests on the proposition that, because the commissioner has dragged her feet in processing and resolving claims, and because other claimants have not pursued legal actions compelling the commissioner to act, all of the claims except those of the plaintiff must be deemed abandoned and no longer pending such that the commissioner is obligated to reallocate all the available funds to the mid-size category and to pay the plaintiff's claims, which, according to the plaintiff's theory, are the only pending claims.

"Accepting the plaintiff's theory would impermissibly extend mandamus beyond its well established limits. See *Wozniak* v. *Colchester*, 193 Conn. App. 842, 855, 220 A.3d 132, cert. denied, 334 Conn. 906, 220 A.3d 37 (2019). The plaintiff has not demonstrated that it has a complete and immediate right to be paid. See *Stewart* v. *Watertown*, 303 Conn. 699, 711, 38 A.3d 72 (2012). Rather, to succeed, the plaintiff requires the court to determine that its claims take priority over all other claims simply because the plaintiff has pursued legal action while other claimants have not. . . .

"The plaintiff fairly characterizes the commissioner's failure for more than ten years to take any significant step to administer the program in conformance with her statutory obligations as making a mockery of the program. To be sure, the Appellate Court's decision in [*Aldin I*] makes clear that the fact that the act does not impose a duty to pay approved applications within a specific time period does not relieve the commissioner of her mandatory duty to pay approved claims 'if . . . there are funds available . . . .' [*Aldin Associates Ltd. Partnership* v. *State*, supra, 209 Conn. App. 771–72]. A

demand for a writ of mandamus ordering the commissioner to pay approved claims in accordance with the priorities and requirements established by the applicable statutes may well be appropriate on the record in this case. But that is not what the plaintiff seeks, perhaps because, if all pending claims were processed and paid in accordance with the act, it appears that the available funds would be largely, if not entirely, exhausted by payments to other claimants." The court therefore determined that the plaintiff did not meet its burden of demonstrating that it was entitled to a writ of mandamus ordering the commissioner to request the comptroller to pay the plaintiff's approved but unpaid claims and rendered judgment in favor of the defendants. This appeal followed.

I

Before we address the merits of the claims raised in this appeal, we briefly address the scope of our remand in *Aldin I*. In its principal appellate brief, the plaintiff asserts: "A claim for mandamus would generally require a court to determine whether the defendants have a mandatory, not discretionary, duty and whether the plaintiff has a clear legal right to have such duty performed. . . . Here, however, the Appellate Court already determined the scope of the defendants' duty in the prior appeal in this action, and the Appellate Court's decision controlled the scope of the proceedings before the trial court on remand . . . ." (Citation omitted.) The plaintiff, citing case law for the general principle that a "trial court cannot adjudicate rights and duties not within the scope of the remand"; (internal quotation marks omitted) *Jepsen* v. *Camassar*, 196 Conn. App. 97, 106, 228 A.3d 376, cert. denied, 335 Conn. 926, 234 A.3d 980 (2020); argues that, because this court "has already concluded that the defendants have a *mandatory duty* to pay the plaintiff's approved claims if there are available funds . . . the sole issue for the

trial court on remand was whether there were available funds in the [program] to pay the plaintiff." (Emphasis in original.) Thus, the plaintiff, in essence, is arguing that the trial court exceeded the scope of our remand in *Aldin I* when it determined that the plaintiff did not meet its burden of demonstrating that it was entitled to a writ of mandamus ordering the commissioner to request the comptroller to pay the plaintiff's approved but unpaid claims. We do not agree.

At issue in *Aldin I* was whether the trial court properly determined that, inter alia, the plaintiff's mandamus claim was barred by sovereign immunity. See *Aldin Associates Ltd. Partnership* v. *State*, supra, 209 Conn. App. 741. In reaching that conclusion, the trial court "determined that the plaintiff's request to compel the commissioner to adjudicate all pending applications satisfied the exception to sovereign immunity for actions by state officers in excess of their statutory authority. The court reasoned that [General Statutes] § 22a-449f (h) imposes a mandatory duty on the commissioner to 'render a decision as to whether . . . to order payment or reimbursement from the program not more than ninety days after receipt of an application . . . .' General Statutes § 22a-449f (h). The court, however, determined that the request to compel the commissioner to pay the plaintiff's approved 2009 application [was] barred by sovereign immunity because the act does not impose a duty on the commissioner to pay approved applications within a specific time frame. The court concluded that, although a portion of the first count is not barred by sovereign immunity, the plaintiff's requests for mandamus 'must rise and fall together.' Accordingly, the court dismissed the first count in its entirety." *Aldin Associates Ltd. Partnership* v. *State*, supra, 748.

On appeal, this court agreed with the trial court's determination that sovereign immunity did not bar the

plaintiff's claim that "the defendants' failure to act on its pending applications constituted actions in excess of the defendants' statutory authority." Id., 763. We disagreed, however, with the court's conclusion that, "because the act does not impose a duty to pay approved applications within a specific time period, the defendants' failure to reimburse the plaintiff is not an act in excess of their statutory authority." Id., 766. We concluded that "the relevant statutes are plain and unambiguous and create a mandatory duty to pay approved applications pursuant to the act." Id., 771. As we stated in *Aldin I*: "We . . . conclude that the court improperly determined that, in the absence of any requirement that the payment be made in a specific time period, the defendants' failure to do so could not be an act in excess of statutory authority. The act requires that approved applications for reimbursement be paid if certain conditions are met. General Statutes § 22a-449f (c). If those conditions are met, the fact that the statute does not specify a specific time period within which payment must be made does not affect the mandatory nature of the duty to pay. Indeed, § 22a-449r (a) (1) expressly provides that any amount available for purposes of paying applicants under the underground storage tank clean-up program *shall be distributed* . . . . Thus, if, as the plaintiff alleges, there are funds available for purposes of paying the plaintiff, the act imposes a mandatory duty on the defendants to pay the plaintiff. Accordingly, the first count of the plaintiff's complaint seeking a writ of mandamus ordering the defendants to pay its approved application is not barred by sovereign immunity." (Emphasis in original; internal quotation marks omitted.) Id., 771–72. Our rescript in *Aldin I* remanded the case "for further proceedings" on the mandamus count of the plaintiff's complaint. Id., 779.

Because the trial court had dismissed the mandamus count on jurisdictional grounds, it never addressed the

merits of the claim. This court simply determined that the court had jurisdiction over the mandamus count. Thus, our remand for further proceedings on that count necessarily was a remand for the mandamus claim to be considered on its merits. Even though this court concluded in *Aldin I* that the defendants have a mandatory duty to pay the plaintiff's claims under the statute as long as "certain conditions are met" and if "there are funds available for purposes of paying the plaintiff"; id., 771–72; on remand the plaintiff still had to demonstrate its entitlement to the remedy of a writ of mandamus directing the defendants to pay its claims. We conclude, therefore, that the court did not exceed the scope of our remand in *Aldin I* when it held the plaintiff to its burden of establishing its entitlement to a writ of mandamus. We now turn to the merits of the plaintiff's claims on appeal.

## II

The plaintiff first claims that the court improperly concluded that it is not entitled to a writ of mandamus directing the defendants to pay the plaintiff's approved claims under the program. We disagree.

We first set forth the well settled requirements for the issuance of a writ of mandamus and our standard of review. See *AvalonBay Communities, Inc.* v. *Sewer Commission*, 270 Conn. 409, 416–17, 853 A.2d 497 (2004). "[T]he writ of mandamus is an extraordinary remedy to be applied only under exceptional conditions, and is not to be extended beyond its well-established limits." (Internal quotation marks omitted.) *Hennessey* v. *Bridgeport*, 213 Conn. 656, 659, 569 A.2d 1122 (1990). "[M]andamus neither gives nor defines rights which one does not already have. It enforces, it commands, performance of a duty. It acts at the instance of one having a complete and immediate legal right; it

cannot and it does not act upon a doubtful or a contested right . . . . Accordingly, [a] party seeking a writ of mandamus must establish: (1) that the plaintiff has a clear legal right to the performance of a duty by the defendant; (2) that the defendant has no discretion with respect to the performance of that duty; and (3) that the plaintiff has no adequate remedy at law." (Citation omitted; internal quotation marks omitted.) *Wozniak* v. *Colchester*, supra, 193 Conn. App. 855–56. "Even satisfaction of this demanding test does not, however, automatically compel issuance of the requested writ of mandamus. . . . In deciding the propriety of a writ of mandamus, the trial court exercises discretion rooted in the principles of equity." (Citation omitted.) *Hennessey* v. *Bridgeport*, supra, 659. "It is fundamental that the issuance of the writ rests in the discretion of the court, not an arbitrary discretion exercised as a result of caprice but a sound discretion exercised in accordance with recognized principles of law. . . . That discretion will be exercised in favor of issuing the writ only where the plaintiff has a clear legal right to have done that which he seeks." (Internal quotation marks omitted.) *Cooke* v. *Commissioner of Correction*, 194 Conn. App. 807, 827, 222 A.3d 1000 (2019), cert. denied, 335 Conn. 911, 228 A.3d 1041 (2020).

In the present case, the plaintiff's claim for a writ of mandamus is grounded in the statutory scheme governing the underground storage tank petroleum clean-up program. Consequently, for this court to determine whether the plaintiff established a clear legal right to have its applications paid by the commissioner, we must examine the governing statutes and the requirements for the program set forth therein. "The construction of a statute is a question of law subject to de novo review. See *C. R. Klewin Northeast, LLC* v. *Fleming*, [284 Conn. 250, 260, 932 A.2d 1053 (2007)]. When construing a statute, [o]ur fundamental objective is to ascertain and

give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning, General Statutes § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and [common-law] principles governing the same general subject matter . . . .” (Internal quotation marks omitted.) *Aldin Associates Ltd. Partnership* v. *State*, supra, 209 Conn. App. 767.

Therefore, to the extent we must examine the statutory language to determine whether the plaintiff has a clear legal right to payment, our review is plenary. Ultimately, however, we “review the trial court's decision . . . to determine whether it abused its discretion in denying the writ.” *AvalonBay Communities, Inc.* v. *Sewer Commission*, supra, 270 Conn. 417.

We now turn to the language of the relevant statutes, which this court set forth in *Aldin I.* “Section 22a-449c (a) (2) provides in relevant part that ‘[t]he program shall provide money for reimbursement or payment pursuant to this section . . . within available appropriations, to responsible parties . . . .’ Section 22a-449f (c) provides in relevant part that ‘[t]he commissioner *shall order reimbursement or payment* from the program for any cost paid or incurred, as the case may be,

[if all of the conditions for reimbursement are satisfied] . . . .' . . . In the event that an applicant files an administrative appeal from the commissioner's decision pursuant to § 22a-449g, 'any portion of the ordered reimbursement or payment that is approved and not the subject of such appeal, *shall be paid* by the commissioner, within available appropriations and subject to the provisions of section 22a-449r, notwithstanding the pendency of the appeal.' . . . General Statutes § 22a-449g.

"Section 22a-449r (a) (1) establishes the order of priority for payments from the program and directs that 'any amount available for purposes of paying applicants under the underground storage tank clean-up program *shall be distributed* as follows: (A) [o]ne-quarter for payment or reimbursement to municipal applicants and other applicants; (B) one-quarter for payment or reimbursement to small station applicants; (C) one-quarter for payment or reimbursement to mid-size station applicants; and (D) one-quarter for payment or reimbursement to large station applicants. If at any time there is an amount remaining in one such category and if in such category there are no pending applications or applications for which payment or reimbursement has been ordered by the commissioner but has not been made . . . then such amount *shall be redistributed* for payment or reimbursement in the following order of priority: (i) [f]irst to municipal applicants and other applicants, (ii) if after redistribution pursuant to subclause (i) of this subdivision there is an amount remaining, then to small station applicants, (iii) if after redistribution pursuant to subclauses (i) and (ii) of this subdivision there is an amount remaining, then to mid-size station applicants, and (iv) if after redistribution pursuant to subclauses (i), (ii) and (iii) of this subdivision there is an amount remaining, then to large station applicants.' . . .

"Section 22a-449r (c) (2) (A) provides in relevant part: 'In the fiscal year beginning July 1, 2012, no payment shall be made to mid-size station applicants in excess of thirty-five cents on each dollar the commissioner orders to be paid or reimbursed under the program. In the fiscal year beginning July 1, 2013, and each fiscal year thereafter, such amount shall increase by ten cents on each dollar per fiscal year and in such years no payment or reimbursement shall be made in excess of the amount in effect for such fiscal year. After such amount reaches one dollar, it shall no longer increase. . . .'

"Section 22a-449r (c) (4) provides in relevant part: 'Among mid-size station applicants . . . priority for payment or reimbursement shall be given to those applicants who . . . agree to accept the greatest reduction in the amount ordered for payment or reimbursement by the commissioner under the program, provided such payment shall not exceed the amount set forth in subparagraph (A) or (B) of subdivision (2) of this subsection, as applicable. . . . If there are insufficient funds to satisfy payment and reimbursement of mid-size and large station applicants, the prioritization established pursuant to this subsection shall carry over to the subsequent fiscal quarter, and if necessary, from year to year, provided such prioritization may change based upon a subsequent reduced payment election submitted pursuant to subparagraph (A) (ii) of subdivision (3) of this subsection.' " (Emphasis in original.) *Aldin Associates Ltd. Partnership* v. *State*, supra, 209 Conn. App. 769–70.

Our review of the relevant statutes demonstrates that they clearly and unambiguously establish an order of priorities for claims and set up a framework for how claims are to be paid. First, the $36 million allocated to fund the program has been divided equally among the four categories of claimants, as required per § 22a-449r (a) (1). Since the time of that funding, payments

have been made from the fund to applicants, leaving $445,734.35 for municipal and other applicants, $1,853,003.38 for large applicants, $447,904.69 for small applicants, and $4310.58 for mid-size applicants. Thus, there currently are funds remaining in each category for payment to claimants. Under the statutory scheme, "[i]f at any time there is an amount remaining in one such category *and* if in such category there are no *pending* applications or applications for which payment or reimbursement has been ordered by the commissioner but has not been made . . . then such amount shall be redistributed for payment or reimbursement" in a certain order of priority. (Emphasis added.) General Statutes § 22a-449r (a) (1). Only when those conditions are met can the amounts remaining in the various categories be redistributed to other categories for payment, first to municipal and other applicants and then to small station applicants. See General Statutes § 22a-449r (a) (1). Then, only after all claims in those categories are exhausted and there are leftover funds can any remaining funds be redistributed to mid-size applicants. See General Statutes § 22a-449r (a) (1). The plaintiff, therefore, has a significant hurdle to surmount to be able to demonstrate its entitlement to be paid; that is, contrary to the plaintiff's assertions, the funds in other categories cannot simply be redistributed into the mid-size category for payment to the plaintiff. The plaintiff must show that "there are no pending applications or applications for which payment or reimbursement has been ordered by the commissioner but has not been made" in each of the categories for municipal and other applicants and small station applicants before funds in those categories can be redistributed to the mid-size applicant category. See General Statutes § 22a-449r (a) (1).

Moreover, a reverse auction system has been established for mid-size station owners such as the plaintiff.

That means that "priority for payment or reimbursement shall be given to those applicants who . . . agree to accept the greatest reduction in the amount ordered for payment or reimbursement by the commissioner under the program . . . ." General Statutes § 22a-449r (c) (4). Thus, it follows that the order of priority of claims in the mid-size station applicant category can change if an applicant elects a reduction in the amount owed to it greater than other applicants in the category. In such a case, the applicant will take priority over any other applicants who have chosen a lesser reduction. As it stands presently, Alliance Energy, a mid-size station applicant, has elected a reduction in its claim for $342,163.16 to thirty-five cents on the dollar. Because the plaintiff has elected a reduction only to ninety-five cents on the dollar, Alliance Energy's claim takes priority over that of the plaintiff. With $4310.58 remaining in the fund for mid-size station applicants, there simply are not enough funds remaining in the mid-size category to pay the plaintiff after satisfaction of Alliance Energy's claim.[7]

Therefore, the viability of the plaintiff's assertion that there are sufficient funds to pay its approved applications is dependent on two conditions: first, funds have to be moved from other categories into the mid-size station applicant category, which the plaintiff acknowledges would need to be done, and second, in order for the commissioner to do that, there must be "no pending applications *or* applications for which payment or reimbursement has been ordered by the commissioner but has not been made . . . ."[8] (Emphasis added.) General

[7] Under the reverse auction system, the plaintiff's applications could take priority over Alliance Energy's application if the plaintiff agreed to accept a greater reduction in the amount ordered for payment or reimbursement by the commissioner than the reduction selected by Alliance Energy. The plaintiff has not done so.

[8] According to the plaintiff, "there are no applications for which payment or reimbursement has been ordered but not made." Specifically, the plaintiff argues that, although "some applications have been categorized by the defen-

Statutes 22a-449r (a) (1). Central to the plaintiff's claim is the issue of whether there are "pending" applications in any of the categories. The plaintiff asserts that "the unresolved applications on which the commissioner, through McDowell, has taken virtually no action for multiple years cannot be deemed to constitute 'pending' applications." Instead, the plaintiff argues that such applications should be treated as abandoned, as the evidence shows that they are not being, nor have they been, pursued by either the commissioner or any of the other applicants. Therefore, the plaintiff argues that when all other applications are deemed abandoned,[9]

---

dants as 'awarded not paid,' this merely means that the application has been adjudicated—no order of payment has been issued. Had any such order been issued, the comptroller would have issued a check. Thus, this court need only decide whether the other applications may properly be considered 'pending' pursuant to the statutory scheme." Even if we assume, without deciding, that the plaintiff is correct and we should limit our review to whether there are any "pending" applications, the plaintiff's claim that no pending applications exist fails for the reasons stated herein.

[9] In its appellate brief, the plaintiff relies on the language of § 22a-449f (h) requiring the commissioner to render a decision as to whether to order payment not more than ninety days after receipt of an application and asserts that "the statutory scheme indicates that an application should not be considered 'pending' for more than ninety days as after such period, it must either be denied or payment ordered. . . . Applications as to which no action has been taken for years cannot be considered 'pending' in the context of the . . . statutory scheme as it would lead to the absurd and unworkable result that the defendants could circumvent the statute and make no payments of available funds, by merely failing to act." This court noted in *Aldin I* that, "[a]t the time the plaintiff commenced this action, some of [its] applications had been approved and paid, at least one application had been approved in 2009 but remained unpaid, and the commissioner had failed to act on the plaintiff's remaining applications." *Aldin Associates Ltd. Partnership* v. *State*, supra, 209 Conn. App. 746. Thus, many of the plaintiff's own applications were not acted on within the ninety day period of § 22a-449f (h). The defendants assert in their appellate brief that "[b]y the plaintiff's own argument . . . those applications should have simply been deemed denied . . . ." In its appellate reply brief, however, the plaintiff clarifies that it is not claiming that "any application pending for more than ninety days is automatically deemed denied." Rather, the plaintiff contends that it has relied on the ninety day provision "to demonstrate the legislature's intention that applications be processed promptly and to indicate that applications as to which there has been no action by the applicant or the defen-

there are available funds to move to the mid-size appli-
cant category to pay its claims. In support of this argu-
ment, the plaintiff argues that the term pending "in
its common and ordinary usage implies an *ongoing*
process." (Emphasis in original.)

The defendants counter that "the plaintiff's claim is
premised on the fictional assertion that [its] applica-
tions are the only ones that exist before the [commis-
sioner under the program]. It argues this despite there
being tens of millions of dollars in applications still
unapproved or unpaid, including many ahead of the
plaintiff in line for payment. Because § 22a-449r does
not support the wholesale elimination of those other
applications—including applicants to be paid before
the plaintiff—the plaintiff failed to demonstrate a clear,
immediate right to mandamus  .  .  .  ." The defendants
further argue that the plaintiff has not addressed the
court's conclusions but, rather, is attempting "to reliti-
gate the impact of the proffered evidence before this
court."

With respect to the plaintiff's argument regarding
abandonment, the defendants acknowledge that "many
of the remaining applications have various issues requir-
ing disentanglement" but argue that the commissioner
does not have discretion under the statutory scheme
to deem applications abandoned and that the plaintiff
has provided no authority to support "its argument that
any application not being actively pursued against the
state through litigation or other means should be factu-
ally deemed 'abandoned.' " If this court were to do so,
the defendants argue, we would be adding language to
§ 22a-449r that does not exist in the statute, in violation

---

dants for much, much longer than ninety days should be deemed aban-
doned." In making this argument, the plaintiff does not define "much longer
than ninety days," other than to imply that its applications fall on the not
too long side of the line, while everyone else's fall on the much too long
side of the line.

of well established rules of statutory construction. We agree with the defendants.

The word "pending" is not defined in the statute. "When a statute does not define a term, General Statutes § 1-1 (a) directs that we construe the term according to its commonly approved usage, mindful of any peculiar or technical meaning it may have assumed in the law. We may find evidence of such usage, and technical meaning, in dictionary definitions, as well as by reading the statutory language within the context of the broader legislative scheme." (Internal quotation marks omitted.) *Dorfman* v. *Liberty Mutual Fire Ins. Co.*, 227 Conn. App. 347, 398, 322 A.3d 331 (2024), petition for cert. filed (Conn. November 1, 2024) (No. 240194), and cross petition for cert. filed (Conn. December 13, 2024) (No. 240229). Merriam-Webster's Collegiate Dictionary defines the word pending as "not yet decided: being in continuance . . . ." Merriam-Webster's Collegiate Dictionary (11th Ed. 2014) p. 915. When that definition is applied to the facts of the present case, the inescapable conclusion is that there are pending applications in all four categories of applicants. As exhibits one and eight demonstrate, there are more than 1500 existing claims in various stages—new, supplemental, tabled, or awarded but not paid—across the four categories of applicants that seek reimbursement under the program. The total amount of those claims exceeds $65 million. A reasonable conclusion is that these claims, which, for various reasons, have not yet been finally decided, are pending.[10]

---

[10] Our interpretation of "pending" is consistent with how our Supreme Court defined the word in *Board of Education* v. *Freedom of Information Commission*, 217 Conn. 153, 161, 585 A.2d 82 (1991), on which the plaintiff relies. In that case, the court noted: " 'Pending' has been defined as '[b]egun, but not yet completed; before the conclusion of'; Black's Law Dictionary (5th Ed. 1979); and '[not] yet decided or settled; awaiting conclusion or confirmation.' American Heritage Dictionary (2d College Ed. 1985). From these definitions it may reasonably be inferred that a pending claim is one already in existence and in progress. . . . *We do not discern in the applicable definitions a requirement that a claim, to be 'pending,' must be formally*

The plaintiff argues that "pending" under the statute requires that the claim is being actively pursued, either by the commissioner or the applicant. The plaintiff, however, has failed to provide authority to support its position, nor is there any language in the statute that supports its interpretation. Moreover, the plaintiff's position operates on the assumption that, because the plaintiff is the only applicant to have pursued its application by way of a legal action, the other applicants must be deemed to have abandoned their claims for reimbursement under the program. That is, because the plaintiff has pursued legal action to obtain reimbursement for its claims pursuant to the program and other applicants have not done so, and because the commissioner has not taken any action with respect to those other applications, some of which have languished for ten years now, this court should not deem those other applications as "pending" for purposes of the statute. For this court to adopt the plaintiff's position, we would have to read provisions into the statute that do not exist, as there is no language in the relevant statutes that provides a means by which claims can be deemed abandoned, nor is there language requiring an applicant to take any particular action following its submission of an application seeking reimbursement. "We are not in the business of writing statutes; that is the province of the legislature. Our role is to interpret statutes as they are written. . . . [We] cannot, by [judicial] construction, read into statutes provisions [that] are not clearly stated." (Internal quotation marks omitted.) *Rider* v. *Rider*, 210 Conn. App. 278, 288, 270 A.3d 206 (2022); see also *Jakobowski* v. *State*, 219 Conn. App. 839, 859, 296 A.3d 226 (2023) ("We are mindful that,

---

*under adjudication*." (Emphasis added.) Id. Similarly, in this case, the other applications that are an impediment to the plaintiff are pending despite the fact that none of those applicants appears to have pressed for a formal adjudication and the commissioner has not adjudicated all of those applications.

in the absence of ambiguity, courts cannot read into statutes, by construction, provisions which are not clearly stated . . . . Moreover, [i]t is a well settled principle of statutory construction that the legislature knows how to convey its intent expressly . . . or to use broader or limiting terms when it chooses to do so. . . . [O]ur case law is clear . . . that when the legislature chooses to act, it is presumed to know how to draft legislation consistent with its intent . . . .” (Citation omitted; internal quotation marks omitted.)); *Kruger* v. *Grauer*, 173 Conn. App. 539, 558, 164 A.3d 764 (“[our] . . . court[s] [are] precluded from substituting [their] own ideas of what might be a wise provision in place of a clear expression of legislative will” (internal quotation marks omitted)), cert. denied, 327 Conn. 901, 169 A.3d 795 (2017).

This court is puzzled by the failure of the commissioner to administer the program in a timely manner, as the record demonstrates that the commissioner has taken no action on many of the hundreds of claims submitted under the program for as long as ten years now. We also understand the plaintiff’s frustrations[11] over the defendants’ inaction in approving and paying claims for station owners who remediated their properties pursuant to the program with the expectation of being reimbursed, at least to some extent. The statutory scheme, however, does not provide for a way in which claims that have not been acted on in nearly ten years, either by the commissioner or the claimant, can be deemed abandoned, as the plaintiff would have this court conclude. Not to mention, the plaintiff’s position would require this court to deem more than 1500 claims

---

[11] As the plaintiff notes in its appellate brief: “The defendants’ position, as expressed in McDowell’s testimony, is that so long as there are applications that remain unresolved, no funds will be available to pay the plaintiff’s approved applications—regardless of whether the other applications remain unresolved for one year or for thirty years.”

abandoned, without any notice to the claimants, which raises due process concerns. See *In re Gabriel S.*, 347 Conn. 223, 233, 296 A.3d 829 (2023) ("[a]n elementary and fundamental requirement of due process in any proceeding [that] is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections" (internal quotation marks omitted)); *Khan* v. *Yale University*, 347 Conn. 1, 30, 295 A.3d 855 (2023) ("[t]he essence of due process is the requirement that a person in jeopardy of a serious loss [be given] notice . . . and [an] opportunity to [be heard]" (internal quotation marks omitted)); *Romanelli* v. *Dept. of Social Services*, 226 Conn. App. 131, 142, 317 A.3d 807 (2024) ("[a] fundamental principle of due process is that each party has the right to receive notice . . . and the opportunity to be heard at a meaningful time and in a meaningful manner" (internal quotation marks omitted)). As long as there exist pending applications, those claimants are entitled to at least some kind of notice before any such application can be deemed abandoned, especially when the statute does not impose any requirement on a claimant, following submission of an application under the program, to undertake any particular actions concerning the claimant's application. We are constrained by the statutory language and cannot write provisions into statutes that do not exist. See *King* v. *Hubbard*, 217 Conn. App. 191, 210, 288 A.3d 218 (2023).

For the foregoing reasons, the plaintiff has not demonstrated the existence of a clear legal right to be paid the $2,253,323.96 it claims is due and owing from the commissioner under the program. The evidence in the record shows that, although $2,750,953 in funds remain in the program, those funds are allocated among the four categories of applicants, with $445,734.35 being allocated for municipal and other applicants, $1,853,003.38

for large applicants, $447,904.69 for small applicants, and only $4310.58 for mid-size applicants. The plaintiff assumes that because the amount of the funds remaining in the program is greater than the total amount of its claims, it has established that there are sufficient funds for payment of its claims.[12] As we have indicated, however, under the statutory framework most of those funds are allocated to other categories, for which many claims remain pending. With respect to the plaintiff's mid-size category, there is a claimant with priority over the plaintiff with a claim that, if paid, will leave no remaining funds for the plaintiff to be paid.

We agree with the trial court that "[a] demand for a writ of mandamus ordering the commissioner to pay approved claims in accordance with the priorities and requirements established by the applicable statutes may well be appropriate on the record in this case." But, as the trial court noted, "that is not what the plaintiff seeks, perhaps because, if all pending claims were pro-cessed and paid in accordance with the act, it appears that the available funds would be largely, if not entirely, exhausted by payments to other claimants."

---

[12] The dissent, which appears to agree with this assumption, contends that, "it is undisputed that the program, although now discontinued, has funds remaining to satisfy the plaintiff's claims." We disagree. The dissent's contention overlooks the clear and unambiguous language of § 22a-449r (a) (1) setting forth the order of priorities for payment of claims and the reverse auction system set forth in § 22a-449r (c) (4). Under the system established pursuant to the relevant statutes, as the evidence presented to the court demonstrated, there are not sufficient funds in the plaintiff's category of claimants to pay the plaintiff's claims, there are many pending claims in other categories, and, under the reverse auction system, there is another claimant with priority for payment ahead of the plaintiff in the mid-size station category. Because there are numerous pending claims, many of which also have been approved, there is a substantial factual dispute as to whether there are funds to satisfy the plaintiff's claims. Moreover, we also disagree with the dissent's suggestion that "the state need not pay a deserving claim simply by asserting that there are other pending claims . . . ." The record in the present case demonstrates that the court's conclusion was based on evidence and testimony detailing all of the pending claims.

We conclude that the court properly determined that the plaintiff did not meet its burden of demonstrating that it is entitled to a writ of mandamus ordering the commissioner to request the comptroller to pay the plaintiff's approved but unpaid claims. Accordingly, the court did not abuse its discretion in denying the plaintiff's request for a writ of mandamus.

## III

The plaintiff, in an effort to avoid the impact of the trial court's reasoning, next claims that, after it "made an initial showing that there [are] sufficient funds in the [program] to pay the plaintiff's approved claims . . . the trial court err[ed] in failing to shift the burden to the defendants to prove that there were other viable applications to the [program] that rendered such funds 'unavailable' to pay the plaintiff." In support of this claim, the plaintiff argues that neither this court's decision in *Aldin I* "nor the statutory scheme addresses which party should have the burden of proof to establish the existence (or nonexistence) of available funds." In such circumstances, the plaintiff argues that, in light of the purpose of the statute and equitable considerations, the burden should be on the defendants to demonstrate which claims are " 'pending,' " as they are the parties seeking to reduce the amount that would otherwise be awarded to the plaintiff by asserting that there are pending claims in the various categories of applicants. The plaintiff further asserts: "Shifting the burden to the defendants *after the plaintiff made an initial showing that there were sufficient funds in the* [*program*] *to pay its claims* would also avoid requiring the plaintiff to prove a negative—that there were no viable, nonabandoned claims by other applicants." (Emphasis added.) Otherwise, as the plaintiff argues, it would have had to "establish the status of over 1500 separate claims to the [program]." The plaintiff acknowledges that the statutory scheme does not provide for any such burden

shifting but argues, nonetheless, that this court should graft such a requirement onto the statutes. We do not agree with the plaintiff and decline to do so.

The plaintiff's burden shifting argument is premised on the presumption that the plaintiff made an initial showing that there are sufficient funds in the program to pay its claims. As we explained in part II of this opinion, we are not persuaded that the plaintiff has done so. The plaintiff presented evidence establishing that $2,750,953 in overall funds remain in the program and are available for payment. Of those funds, $445,734.35 is left in the category for municipal and other applicants, $1,853,003.38 for large applicants, $447,904.69 for small applicants, and only $4310.58 for mid-size applicants. The statutory scheme clearly limits how and when the funds in each category may be redistributed to another category and, further, establishes a priority for redistribution, which places two categories of applicants above the mid-size applicant category to which the plaintiff belongs. Accordingly, establishing that $2,750,953 in overall funds remain in the program for payment is not the same as establishing that those funds are available to pay the plaintiff. The plaintiff did not make an initial showing that there are sufficient funds in the program to pay its approved claims, and, therefore, its burden shifting argument necessarily fails. Moreover, the plaintiff has not pointed this court to any authority or legislative history of the statutory scheme that would support its position of imposing a burden shifting requirement onto the statutes.

The dissent relies on a number of cases to support its position "that our Supreme Court has not hesitated to engraft a burden shifting scheme on a particular statute, or statutory scheme, in order to render the provisions of the statute under review both practical and reasonable." See *In re Zakai F.*, 336 Conn. 272, 276, 255 A.3d 767 (2020); *State* v. *Swebilius*, 325 Conn.

793, 801, 807–808, 159 A.3d 1099 (2017); *Craine* v. *Trinity College*, 259 Conn. 625, 636–37, 791 A.2d 518 (2002); *Ireland* v. *Ireland*, 246 Conn. 413, 419, 717 A.2d 676 (1998). Although we recognize that courts, at times, have engrafted burden shifting requirements onto statutes, we do not believe that the cases relied on by the dissent or the circumstances of the present case support doing so with respect to the statutory framework governing the program.[13]

First, the statutes governing the program provide explicit detail concerning how claims under the program are to be processed and what a claimant and the

---

[13] We note that the employment discrimination statute at issue in *Craine* and the statute at issue in *Swebilius*, which concerned a situation in which a criminal defendant alleged that an arrest warrant was not served timely on him, both lacked guidance on procedure, which was provided by our Supreme Court. See *State* v. *Swebilius*, supra, 325 Conn. 807–808; *Craine* v. *Trinity College*, supra, 259 Conn. 636–37. By contrast, the statutes at issue in the present case specifically and clearly lay out the procedure for paying claims submitted under the program. Our decision follows the procedure set forth by our legislature, as we are required to do. Moreover, in *In re Zakai F.*, supra, 336 Conn. 272, our Supreme Court decided that "there is a constitutional presumption that reinstatement of guardianship rights to a parent under General Statutes § 45a-611 is in the best interests of the child . . . ." (Footnote omitted.) Id., 275–76. In light of that presumption, the court also concluded "that the party opposing reinstatement must rebut this presumption by clear and convincing evidence." Id., 276. We do not agree that this provides support for imposing a "burden shifting" requirement onto the statutory scheme involved in this case, which involves no constitutional rights or presumptions. Finally, we note that in *Ireland*, our Supreme Court specifically stated that, "[u]nlike some of our sister states, Connecticut has no statute specifically governing situations in which a custodial parent wishes to relocate with his or her child," which was the issue in that case. *Ireland* v. *Ireland*, supra, 246 Conn. 419–20. The burden shifting scheme imposed in that case was not grafted onto a statute. Indeed, following *Ireland*, our legislature enacted General Statutes § 46b-56d, which establishes the analysis a court is to apply when deciding a postjudgment motion to relocate with a minor child and "adopted the factors set forth by our Supreme Court in *Ireland* . . . ." *N. R.* v. *M. P.*, 227 Conn. App. 698, 718, 323 A.3d 1142 (2024). Therefore, the dissent's reliance on these cases to support imposing a burden shifting scheme on the statutes at issue in the present case is misplaced.

commissioner must do. Significantly, the present case is not a situation in which the statutory framework does not work; rather, the plaintiff seeks to impose a burden shifting requirement because it is frustrated with how long the commissioner has taken in processing and paying claims. In other words, the plaintiff essentially is seeking to impose a burden shifting requirement as a sanction for the defendants' prolonged delays in administering the program. As we have stated and as was suggested by the trial court, the way to solve this problem is for the plaintiff to seek a writ of mandamus ordering the commissioner to resolve all of the "pending" claims, not by adding an ad hoc burden shifting requirement to a statutory framework that already provides in great detail how claims under the program are to be administered.

Additionally, we underscore the fact that the implications of imposing a burden shifting requirement onto the statutory framework extend far beyond the dispute at issue in the present case. As we have stated, there are more than 1500 existing claims in various stages—new, supplemental, tabled, or awarded but not paid—across the four categories of applicants that seek reimbursement under the program. If this court were to adopt the burden shifting scheme proposed by the plaintiff and the dissent and if the defendants did not meet that burden, numerous entities that are not parties to this action could be adversely impacted, without any notice or opportunity to be heard. This raises serious due process concerns, which we have outlined in this opinion and which have not been addressed by the dissent. We also must be mindful that the plaintiff here seeks a writ of mandamus. It is well established in our case law that the plaintiff, as the party seeking a writ of mandamus, bears the burden of establishing that it has a clear legal right to payment from the defendant. See *Wozniak* v. *Colchester*, supra, 193 Conn. App. 856;

see also *Stewart* v. *Watertown*, supra, 303 Conn. 711–12. Thus, the plaintiff unquestionably bore the burden of demonstrating that it had a clear legal right to be paid for its approved application, which it failed to do. As we previously noted, "[t]he writ of mandamus is an extraordinary remedy to be applied only under exceptional conditions, and is not to be extended beyond its well-established limits." (Internal quotation marks omitted.) *Hennessey* v. *Bridgeport*, supra, 213 Conn. 659. An applicant for the writ cannot achieve this extraordinary remedy by shifting the burden to the governmental official to prove that the applicant is *not* entitled to the writ. Sanctioning the burden shifting suggested by the plaintiff and the dissent would clearly expand the writ "beyond its well-established limits." (Internal quotation marks omitted.) Id.

We understand, as well, that it is the duty of a court to "construe a statute in a manner that will not frustrate its intended purpose or lead to an absurd result." (Internal quotation marks omitted.) *Mack* v. *LaValley*, 55 Conn. App. 150, 166, 738 A.2d 718, cert. denied, 251 Conn. 928, 742 A.2d 363 (1999). The plaintiff maintains that "[t]he contention that no funds are available to pay the plaintiff's approved applications so long as there are applications that remain unresolved, whether that lasts for one year or forty years, must be rejected as an absurd and unworkable interpretation of the statutory scheme. Instead, in order to satisfy the statutory purpose of the [program] and in order to avoid an absurd and unworkable result, the unresolved applications as to which the commissioner has taken virtually no action, often for over a decade, cannot be deemed to constitute 'pending' applications for determining available funds." This argument, like many others of the plaintiff, illustrates its frustration over the defendants' inaction in administering payments under the program.

This court is equally perplexed by the defendants' prolonged delays in addressing claims submitted under the program. Nonetheless, for the reasons stated herein, we do not believe that it is within the province of this court to add requirements to the statutory framework governing the program, whether they be time limitations, rules for deeming an application abandoned or a burden shifting scheme.[14] See *PPC Realty, LLC* v. *Hartford*, 350 Conn. 347, 358, 324 A.3d 780 (2024) (declining to graft language onto statutes that does not exist); *State* v. *Wilchinski*, 242 Conn. 211, 232, 700 A.2d 1 (1997) (same); *Rider* v. *Rider*, supra, 210 Conn. App. 288 (same); *In re Probate Appeal of Knott*, 190 Conn. App. 56, 60 n.8, 209 A.3d 690 (2019) ("[t]he role of the courts is not to rewrite statutes or graft exceptions onto the language existing therein; that is a function of the legislature"); *Asia M.* v. *Geoffrey M.*, 182 Conn. App. 22, 33, 188 A.3d 762 (2018) ("[I]t is not the function of the courts to enhance or supplement a statute containing clearly expressed language. . . . Rather, [w]e are obligated to construe a statute as written. . . . Courts may not by construction supply omissions . . . or add exceptions . . . . It is axiomatic that the court itself cannot rewrite a statute . . . . That is a function of

[14] Our conclusion is not inconsistent with the public policy of the statutes governing the program, as the dissent suggests. In addition to the plaintiff, numerous other entities, encouraged by the program to remove potentially problematic underground storage tanks, have done so and submitted claims for reimbursement. In this majority opinion, we hold that claims by those entities cannot be disregarded simply because the plaintiff has decided to take a more aggressive approach to pursuing its claims through litigation. This majority opinion, therefore, cannot be construed as discouraging businesses from addressing the environmental concerns that prompted the enactment of the program, especially given that the program has long been discontinued. Moreover, the plaintiff could pursue a mandamus asking the court to order the commissioner to complete its evaluation of all claims under the program, which would be the fairest solution for all claimants who did their part under the program. As the trial court recognized, however, the plaintiff has chosen not to pursue that remedy, which likely would result in there being insufficient funds to pay the plaintiff's claims.

the legislature." (Citation omitted; internal quotation marks omitted.)).

In summary, the plaintiff, having failed to establish that it has a clear legal right to be paid $2,253,323.96 for its approved claims, has not demonstrated that the court abused its discretion in denying its request for a writ of mandamus ordering the commissioner to order the comptroller to pay the plaintiff's approved claims. Nor has the plaintiff persuaded us that we should impose onto the statutes governing the program a burden shifting requirement for the defendants to establish the existence of any "pending" claims.

The judgment is affirmed.

In this opinion BRIGHT, C. J., concurred.